RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0135P (6th Cir.)
File Name:  01a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　　*v.*

CHRISTOPHER MARSHALL,
　　　*Defendant-Appellant.*

No. 99-4053

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00454—Lesley Brooks Wells, District Judge.

Argued:  February 2, 2001

Decided and Filed:  April 25, 2001

Before:  DAUGHTREY and GILMAN, Circuit Judges;
COLLIER, District Judge.[*]

---

## COUNSEL

**ARGUED:**　Margaret S. O'Donnell, McNALLY &
O'DONNELL, Frankfort, Kentucky, for Appellant.  Gary D.
Arbeznik, ASSISTANT UNITED STATES ATTORNEY,

---

[*] The Honorable Curtis L. Collier, United States District Judge for the
Eastern District of Tennessee, sitting by designation.

1

Cleveland, Ohio, for Appellee. **ON BRIEF:** Margaret S. O'Donnell, McNALLY & O'DONNELL, Frankfort, Kentucky, for Appellant. Gary D. Arbeznik, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. COLLIER, D. J. (pp. 27-41), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. This case involves the theft of $60,000 from a bank's automated teller machine (ATM) by Christopher Marshall, a Pinkerton Security Company courier. Marshall was convicted on two counts of bank larceny and possessing stolen money in violation of 18 U.S.C. § 2113(b) and § 2113(c), one count of engaging in an unlawful monetary transaction exceeding $10,000 in violation of 18 U.S.C. § 1957, three counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and one count of filing a false statement on a federal currency transaction report in violation of 31 U.S.C. § 5313 and § 5324(a)(2). He was sentenced to 36 months of imprisonment on each count, to be served concurrently, with a 3-year period of supervision after his release. For the reasons set for below, we **VACATE** his three 18 U.S.C. § 1956(a)(1)(B)(i) money-laundering convictions and, with the consent of the government, we also **VACATE** Marshall's 18 U.S.C. § 2113(c) conviction. These counts of the indictment are **REMANDED** to the district court for entry of a judgment of acquittal. We **AFFIRM** the remaining three convictions.

## I. BACKGROUND

### A.  Factual background

Society Bank (now known as Key Bank) had a contract with Pinkerton to maintain the cash supply of Society's ATMs.  Marshall, along with his partner Jim Myers, were Pinkerton couriers who performed ATM maintenance throughout the Akron-Canton area in Ohio.  Together they serviced between ten and twelve locations each day.

The procedures for servicing each ATM were rather elaborate, as was the system for accessing the ATM vault.  At each machine being serviced, the pair of couriers would have a master key, allowing entry into the restricted-access portion of the ATM building.  Once the outside door was opened, the couriers had to punch in a security code to disarm the alarm system.  The couriers were then required to call a central ATM security service in Dayton in order to identify themselves and advise the service of their presence at the ATM.  Once inside the ATM building, the couriers opened the ATM vault.  This was done by using a combination lock unique to each ATM, adjusting the handle in a specific manner, and inserting a vault combination key into the vault door dial to allow the door to release.  The moment it was opened, the security service in Dayton was alerted by an electronic signal notifying the service that the vault had been accessed.

Marshall and Myers serviced the ATM at the Cuyahoga Falls Avenue location of the Society Bank ATM on December 31, 1993.  After performing their various duties, they left $90,000 of "extra money" in the vault, a practice that allows the ATM to be serviced after normal banking hours.  Marshall testified at trial that this was an unusually large amount of extra money to leave in the vault.  This extra money had been prepackaged into bricks at the bank.  Each brick contained 1,000 bills, and was individually packaged in shrinkwrap plastic.  Three of the bricks contained $20,000 each in $20 bills, and three of the bricks contained $10,000 each in $10 bills.  Marshall testified that he placed the extra

money in the vault without disturbing the plastic packaging. Once the servicing was complete, the vault was closed, the alarm was activated, and the outside door was locked.

Three days later, on January 2, 1994, the central ATM security service in Dayton recorded an electronic signal at 6:30 p.m., indicating that the vault at Society Bank's Cuyahoga Falls ATM had been accessed. The signal showed that the vault door remained open for 28 seconds, was closed, and then reopened for good 6 seconds later. Although the ATM security service is supposed to respond to and investigate unauthorized openings of the vault, no such action was taken. Tina Adolphson was the first person to use the ATM after it was opened on January 2, 1994. At trial, Adolphson testified that she noticed that the ATM restricted-access door was ajar when she was conducting her transaction, but that she did not see anyone around the machine either before or after.

Marshall and Myers did not return to service the Cuyahoga Falls ATM again until the following day, January 3, 1994. Upon approaching the ATM, Myers noticed that the restricted-access door to the building had been left slightly ajar, but he saw no other person inside. After checking the vault, he realized that the three $20,000 bricks were missing. Myers testified at trial that there were no signs of forced entry on the ATM restricted-access door or the vault. Rather, the vault alarm had been deactivated. He also testified that the only physical evidence at the scene consisted of the plastic shrinkwrap that had been removed from the purloined money. The only intact fingerprints that were found on the discarded plastic belonged to Marshall.

Almost four years prior to this incident, Marshall had filed for bankruptcy. In the subsequent years, his annual reported income ranged from $11,697 to $23,855. He rarely had more than two thousand dollars in the bank and, as of December 15, 1993, he had accumulated $2,025.83 in credit card debt. Immediately after the larceny, however, Marshall's finances improved dramatically. On January 3, 1994, Marshall

the diamond bracelet, and the collectible wines were motivated, at least in part, by a design or intent to conceal or disguise the nature, the location, the source, the ownership or the control of the bank larceny proceeds. Furthermore, for the reasons stated, I believe the cases cited by the majority in support of its conclusion are factually distinct from the case at hand, and do not mandate vacatur of Marshall's money laundering convictions. Consequently, I must respectfully dissent from that portion of the majority's opinion vacating Marshall's convictions on Counts 3-5.

### III. Conclusion

For the reasons discussed in part I, above, and for the reasons put forth in the majority's opinion, I concur in the decision to **REVERSE** Marshall's conviction for possessing or concealing stolen bank property in violation of 18 U.S.C. § 2113(c). I also concur generally with parts II.A, II.B, II.C, and II.D.2 of the majority's opinion. I must respectfully dissent, however, from the majority's holding with respect to Marshall's money laundering convictions under 18 U.S.C. § 1956(a)(1)(B)(i), as I would **AFFIRM** those convictions for the reasons stated in part II, above.

the past.  Here in contrast, Marshall had never before made purchases such as the three supporting his money laundering convictions.  Although he bought wine from the same merchant previously, he had never purchased collectible wine. The fact Marshall had never conducted similar transactions previously, when viewed in the context of the other evidence discussed above, weighs in favor of his convictions on these counts.

I agree with the sentiment, expressed by the *Sanders* court and the majority in this case, that section 1956 is a money laundering statute, not a "money spending statute."  928 F.2d at 946.  Had the evidence only been sufficient to establish Marshall purchased consumables with the larceny proceeds, instead of also supporting a conclusion he was making investments, I would gladly join the majority's opinion. If the evidence had established Marshall merely made straightforward purchases with the larceny proceeds, I would have considered vacating these convictions. I might also have joined in the decision to vacate if the evidence had not established Marshall clearly expressed a desire and intent to conceal or disguise both the larceny proceeds and his connection with them both before and after the purchases. Finally, I might not have dissented in this case if the evidence had not been sufficient to prove, beyond a reasonable doubt, Marshall lied about how he acquired the Rolex and lied about his reasons for purchasing the diamond bracelet.  In my opinion, however, the evidence in this case precludes my concurrence in the majority's holding with respect to this issue.

As the Tenth Circuit stated in *Garcia-Emmanuel*: "If we had sat on the jury, we might not have convicted [the defendant] for money laundering.  But in reviewing [his] conviction on appeal, we are unable to hold that the jury's conclusion was unreasonable."  14 F.3d at 1478 (internal quotation marks omitted).  After carefully reviewing the record developed at trial, I believe the evidence, when viewed in the light most favorable to the government, would allow a rational jury to conclude Marshall's purchases of the Rolex,

deposited $1,200 cash into an account at the Ohio Savings Bank.  Marshall bought a cashier's check that same day from First National Bank for $2,025.83, which he used to pay off his credit-card balance in full four days later.  On January 4, 1994, Marshall made a cash deposit of $5,000 into his credit union account, bringing his balance to $5,021.05.

The following day, Marshall traveled from Akron to Cleveland to call on his step-brother, John Weston.  Weston was an account executive at Olde Discount, a brokerage firm. Marshall had never been to Weston's office before this visit on January 5, 1994.  Upon his arrival at Weston's office, Marshall told Weston that he wanted to invest money in "short term speculative aggressive trading." He implied that the money he wished to invest belonged to Robin Miller, Marshall's girlfriend.  Marshall told Weston that he had $40,000 in cash located in the trunk of his car, to which Weston's first reaction was "what the hell is Robin doing with $40,000 in cash?"  Weston told Marshall that he could not accept cash, and directed Marshall to obtain a cashier's check. Marshall then proceeded directly to a Bank One branch, where he told Jean Davis, a teller, that he wanted to exchange $40,000 in cash for a certified check payable to Olde Discount.  Davis testified that the $40,000 was all in $20 bills.

Under federal law, currency-transaction reports must be completed for all bank transactions involving more than $10,000.  *See* 31 C.F.R. § 103.22(b)(1) ("Each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000"). Because of the amount involved, Davis called over her supervisor, Diane Aldridge.  Aldridge told Marshall that she would have to speak with Weston to obtain identification, apparently to facilitate the completion of the transaction report.  Marshall then stepped out of the teller line to use his cellular phone. He showed Aldridge a Florida driver's license with a Florida address, even though he also had an Ohio

driver's license. Although Aldridge believed this to be an unusual transaction, she completed the report using the information that Marshall had provided.

In her testimony at Marshall's trial, Aldridge said that Marshall had told her that "[h]e was not the owner of this currency, and that he was merely dropping the money off for this other customer, John Weston, and it was not his money." After Marshall told her this, she spoke with Weston, accepted the cash, and gave Marshall a $40,000 cashier's check payable to Olde Discount. The currency transaction report, listing Weston as the owner of the cash, was then filed as an official bank record.

Marshall returned to Weston's office with the check, remarking that "one of the girls at the bank was awed by the fact that she had never seen so much money before in her life in $20s." At Marshall's direction, Weston opened a joint account with rights of survivorship, with Miller listed first and Marshall second. The joint account listed Miller's annual income as $50,000 and Marshall's as $7,000. Weston then used the account to purchase stocks. Subsequent to the account's creation, phone calls made by Weston to Miller, in order to discuss potential transactions, would be directed by Miller to Marshall, who would approve or disapprove of Weston's suggestions.

Marshall withdrew $7,000 from the brokerage account on January 17, 1994, which he used to purchase a Rolex watch a few weeks later. When Weston subsequently admired the watch, Marshall falsely told him that the Rolex had been a gift from Miller. Marshall also purchased a three-carat diamond tennis bracelet for $2,124 on February 11, 1994, and wine worth at least $1,700 on July 23 and July 28 of that same year. The bracelet and the wine were purchased with Marshall's credit card, the balance of which was paid by using funds that Marshall later withdrew from the brokerage account. Both the Rolex salesman and the wine merchant knew Marshall prior to the purchases in question. The wine

the evidence relating to Marshall's intent with respect to an overall pattern of conduct would allow a reasonable juror to conclude each of the purchases at issue here were designed to conceal the source or origin of the bank larceny proceeds.

*Sanders* also differs from this case in that the car purchases involved in *Sanders* were public and conspicuous. *See also Rockelman*, 49 F.3d at 422. As a result, the transactions were less useful as a means for hiding ill-gotten wealth. Marshall's purchases, however, involved items that could be easily hidden, transported or stored. Any future transfer of ownership, for the purpose of converting the items back into cash, could also be conducted privately. The circumstances present here are thus more probative of an intent to conceal, than was the situation in *Sanders*. *See Norman*, 143 F.3d at 378 (indicating private transactions are more indicative of money laundering than are those of public record).

A final important distinction that can be drawn between this case and the factual scenarios of *Sanders* and *Garcia-Emmanuel*, is based on the fact each of the transactions at issue here was unique in Marshall's experience. In *Garcia-Emmanuel*, the court overturned money laundering convictions premised upon the defendant's payment of his residential mortgage with a cashier's check drawn in his own name, and his partial cash payment for a thoroughbred horse. *Garcia-Emmanuel*, 14 F.3d at 1476-77. In each instance, the court concluded these were straightforward commercial transactions, entered into for the defendant's immediate personal benefit, of a type which the defendant had conducted previously. *Id.* Similarly, in *Sanders* both automobiles simply replaced older automobiles of the same make already owned by the defendant and his wife. *Sanders*, 928 F.2d at 945.

*Garcia-Emmanuel* and *Sanders* therefore involved transactions that were "ordinary" not only because they did not involve any sort of complex financing scheme designed to conceal the purchaser's true identity, but also because they were of a type the defendants in those cases had conducted in

watch prior to the theft. Although Marshall was seen wearing the watch after the purchase, he was still in a position to deny the relationship between the watch and the larceny proceeds, in part because he used his credit card to buy the watch. Moreover, in light of additional evidence Marshall sought to conceal the source of the watch, by saying it was a gift from his girlfriend, a reasonable juror could have concluded Marshall purchased the watch, along with the other items, with an intent to convert proceeds from the bank larceny into assets not immediately traceable to his crime that could be held for a long period of time and then reconverted into cash when the need arose. Even though the statement was made subsequent to the purchase of the watch, the jury could have concluded the statement was indicative of Marshall's intent at the time of the transaction.

In reaching a conclusion contrary to the one I reach here, the majority has relied upon two cases in particular, *United States v. Sanders*, 928 F.2d 940 (10th Cir. 1991), and the previously cited *Garcia-Emmanuel*. While I do not disagree with the majority's interpretation of these two cases, I do believe the cases may be distinguished factually in several crucial ways from the case at hand. Significantly, I note *Sanders* involved a defendant, engaged in an ongoing drug trafficking enterprise, who was convicted of money laundering on the basis of two isolated financial transactions. 928 F.2d at 944, 946; *see also United States v. Rockleman*, 49 F.3d 418 (8th Cir. 1995). In contrast, this case involves a defendant who committed one specified unlawful act, the bank larceny, and then engaged in ongoing efforts over a period of several months to disguise, conceal and use the proceeds of that single crime. Although the money laundering statute is not designed to punish an ongoing course of conduct, the course of conduct may still be relevant to determining a defendant's intent with regard to a particular transaction. *See Sanders*, 946 F.2d at n.4 (distinguishing *United States v. Franklin*, 902 F.2d 501 (7th Cir. 1990) on the basis "defendant's activities in *Franklin* involved both a greater quantity of activity and activity of a qualitatively different nature than that presented here."). Here, I believe

merchant had in fact frequently sold wine to Marshall in the past.

Weston first learned about the January 2, 1994 ATM larceny on August 28, 1994, when he also discovered that Marshall was a suspect. Worried that he would be implicated in the crime, Weston secretly met with Miller and inquired as to the source of the $40,000. Weston then met with an FBI agent a few days later to discuss the brokerage account. Marshall subsequently visited Weston and demanded an explanation for the meeting with the FBI. During the discussion that ensued, Marshall indicated that he wanted the account to "disappear." In response, Weston told him that "if the police or what have you come in and take a look at the account, I can make the account look as if there is nothing there and all the assets are gone."

Marshall then instructed Weston to transfer the money from the joint account into an individual account in Miller's name only. Weston continued to question Marshall about the source of the funds, with Marshall finally admitting that the money was his. According to Marshall's explanation, he had accumulated the $40,000 over a long period of time and had taken out large cash advances on credit cards with the intention of maxing them out so that his then-wife could not use the cards. He claimed that he had later paid off the credit card balances, while keeping the bulk of the money hidden away.

## B.   Procedural background

After several years of investigation, Marshall was finally indicted on December 29, 1998. He was charged with bank larceny, money laundering, and causing a bank to file a false currency-transaction report. Prior to his trial, Marshall filed a motion in limine, seeking to exclude evidence of his "wealth and assets after the alleged larceny took place on January 2, 1994." Marshall claimed that such evidence was irrelevant and unduly prejudicial. The district court denied Marshall's motion.

Marshall testified in his own defense at trial, which began in March of 1999. He claimed to have earned approximately $54,125 in unreported income, mainly during 1992-93. This money, he said, had been stored in his closet due to his distrust of a bank's ability to keep the cash from his ex-wife. Marshall claimed that these funds were the source of the initial deposit into the brokerage account. He also proffered several exhibits to support his explanation as to the source of the money at issue. The exhibits included: (1) a recent *Cruisin' Times* magazine in which Marshall advertised his business of fixing up old cars and selling auto parts, (2) hand-printed receipts from 1997-98 indicating work that Marshall had done on several cars and the money he had received from those jobs, (3) evidence regarding the market for similarly restored vehicles, (4) evidence that Marshall had sold a restored antique vehicle to Suzanne Stephens in 1998, (5) a bank account statement from 1998 that allegedly reflected his propensity to save money, and (6) payroll stubs from the job Marshall held at the time of his trial. Each of the government's objections to these exhibits was sustained by the district court on the ground that they were too remote in time from the larceny to be of any relevance. The district court did, however, allow Marshall to put on evidence regarding his earnings and financial status prior to 1995.

At the conclusion of Marshall's testimony on Wednesday, March 31, 1999, as Marshall was stepping off the witness stand, the district court instructed the parties and the jury to be present at 9:00 a.m. the next morning for the continuation of the trial. When court reconvened the next day, Marshall's counsel informed the court that Marshall was not present and that he could not be located. His counsel then waived Marshall's presence, and the court began to discuss the jury instructions with the lawyers. Nothing in the record indicates if or when Marshall reappeared, although the government maintains that he arrived shortly after 9:00 a.m.

On April 1, 1999, the jury returned a verdict against Marshall on all seven counts. He was later sentenced to 36 months of incarceration on each count, to be served

and services as a way of concealing or disguising the wellspring of the cash. *See United States v. Jackson*, 935 F.2d 832, 841 (7th Cir. 1991), *cited with approval in United States v. Samour*, 9 F.3d 531, 535 (6th Cir. 1993), *overruled on other grounds by United States v. Reed*, 77 F.3d 139 (6th Cir. 1996); *Norman*, 143 F.3d 375, 377 (8th Cir. 1998); *see also United States v. Cencer*, 90 F.3d 1103, 1106 (6th Cir. 1996) (holding evidence bar owner used drug proceeds to run his business was sufficient to support money laundering conviction).

Rather than viewing these purchases as "wearable or consumable items" or as "ordinary commercial transactions," entered into for Marshall's "present personal benefit," I believe a jury, looking at the evidence in the light most favorable to the government, and considering Marshall's admissions on the stand, could have found the three purchases involved "investments," of which the Tenth Circuit said in *Garcia-Emmanuel*: "On the one hand, cases involving investments made with illegal proceeds are close to the core of the statute's purpose of criminalizing changing cash into an 'ostensibly legitimate form, such as business profits or loans, *before using those funds for personal benefit. . . .*'" 14 F.3d 1474 (emphasis in original).

The evidence adduced at trial indicated Marshall did not purchase the wine for consumption and in fact did not consume the wine immediately, but rather intended to hold it as an investment, as he admitted. The evidence also indicated Marshall had never previously purchased collectible wines. When he purchased the diamond bracelet, Marshall told the store clerk he was buying it for his girlfriend, in whose name he attempted to hide the brokerage account, yet nothing in the record indicates the bracelet was ever given to her. Again, the jury could have concluded, on the basis of the record, that Marshall had never made a similar purchase prior to the bank larceny.

Similarly, in the case of the Rolex watch, no evidence was presented to indicate Marshall had ever purchased such a

I think it weighs just as heavily in support of affirming the money laundering convictions. Marshall had enough money in the brokerage account to make the purchases directly. Instead, after using credit cards to make the purchases, Marshall used funds from the brokerage account to pay the credit account balance.

This evidence would have allowed a reasonable jury to conclude Marshall made an effort to place distance between the ill-gotten gains from the larceny and the assets he purchased to replace the cash. *See Norman*, 143 F.3d at 377 (holding intent to conceal could be inferred by funneling of money through several sources prior to ultimate purchase). Moreover, the use of the credit card created documentary evidence of how he acquired the assets, and the paper trail could be used to mislead an investigator. *See Garcia-Emmanuel*, 14 F.3d at 1476-77 (finding such evidence was probative of intent to conceal and supported money laundering convictions). In the event law enforcement, the bank, or Marshall's former employer had discovered the purchases or inquired about them, Marshall would have been able to answer he made the purchases with his credit card and to produce credit card receipts to support his story.

Additionally, I am unable to agree with the majority's characterization of the acquisition of a Rolex watch, a diamond tennis bracelet, and several thousand dollars worth of collectible wine,[2] within a relatively short period of the larceny, as a "few isolated purchases of wearable or consumable items" that do not fall within the purview of § 1956. In each instance, Marshall converted the "dirty" proceeds from the bank robbery into a "clean" asset that could be held for a substantial period of time without significant depreciation in value. A central focus of subsection (a)(1)(B)(i) is to criminalize the conversion of cash into goods

---

[2] Although Marshall admitted the wine was purchased as an investment, *see supra* note 1, it is clear from Marshall's testimony and the testimony of Ron Koly, the wine merchant, that these wines may fairly be characterized as "collectible."

concurrently, followed by 3 years of supervised release. Marshall filed a timely notice of appeal three days later. He challenges his convictions on multiple grounds. First, he argues that the district court erred in admitting evidence of the dramatic improvement in his financial status after the money was stolen. He then asserts that the court was mistaken when it excluded evidence of his alternative sources of income after 1996. Marshall next claims that the district court erred when it proceeded with the charge conference despite his absence from the courtroom at the time. Finally, he challenges the sufficiency of the evidence supporting his convictions for larceny, for filing a false currency-transaction report, and for the three money-laundering convictions relating to the purchases of the watch, bracelet, and wine.

## II. ANALYSIS

### A.   The district court did not abuse its discretion when it admitted evidence of Marshall's "sudden wealth"

In support of the charge that Marshall was the perpetrator of the larceny, the government proffered evidence of Marshall's sudden unexplained wealth in the days following the crime. Marshall owed over $2,000 on his credit card immediately prior to January 2, 1994, and had reported his annual income to be between $11,697 and $23,855 for the past several years. Nevertheless, within a few days following the larceny, he paid off his credit-card balance in full and deposited over $46,000 in cash with two financial institutions and a brokerage firm. Marshall challenges the district court's denial of his motion in limine seeking to exclude this evidence of his sudden unexplained wealth, claiming that it was irrelevant and unduly prejudicial.

In *United States v. Amerine*, 411 F.2d 1130 (6th Cir. 1969), this court addressed the relevance and admissibility of sudden-wealth evidence in a case involving a delivery-truck driver charged with stealing over $36,000 that he was supposed to deliver as part of his job. Although the government had no direct proof of his guilt, it presented evidence of the defendant's opportunity to commit the crime.

The government then introduced evidence of the defendant's modest means prior to the date of the larceny, as contrasted with his payment of old debts and a $2,000 down payment on a new car in the form of $20 bills (the same denomination as the money stolen) immediately after the money disappeared. *Id*. at 1131-32. This court held that "under the total facts of this case, where there was much other evidence of guilt, this testimony was relevant and admissible." *Id*. at 1132. Furthermore, the court also declared that it was proper for the jury to infer from this evidence that "the funds employed by [the defendant] to pay debts and to buy a car came from the missing $36,000." *Id*; *see also United States v. O'Neal*, 496 F.2d 368, 371 (6th Cir. 1974) (holding sudden-wealth evidence was admissible where money in the same denomination as that which was stolen was found on the defendant shortly after the theft).

Marshall seeks to distinguish *Amerine* by claiming that in the present case there was insufficient "other evidence" to support the admission of the sudden-wealth evidence. We disagree. In *Amerine*, the government's only other evidence besides the defendant's unexplained increase in financial resources was his opportunity to commit the crime and his use of currency in the same denomination as that which was stolen. Similarly, the government in the present case produced evidence of Marshall's opportunity to steal the money and the fact that he started the $40,000 brokerage account using two thousand $20 bills.

The circumstantial evidence against Marshall, in fact, was even greater than that which was available in *Amerine*. For example, there was evidence that the only fingerprints on the shrinkwrap were those of Marshall, as well as the testimony of various witnesses detailing Marshall's erratic behavior, inconsistent statements, and his nervousness about the FBI investigation. We therefore conclude that the district court did not abuse its discretion in denying Marshall's motion in limine or in admitting evidence of his sudden wealth. *See Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir.

in this case would allow a reasonable juror to conclude Marshall was motivated, from immediately after the robbery until at least August 1994, by a desire to distance himself from the larceny proceeds, that is, to "conceal [and] disguise the nature, the location, the source, the ownership, or the control" of the larceny proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). For example, on January 5, 1994, when Marshall attempted to exchange a large portion of the larceny proceeds into a cashier's check so he could open a brokerage account in his girlfriend's name, he encountered suspicion and thorough questioning from the bank teller. He also learned large transactions had to be reported to the federal government.

From this evidence, the jury could have inferred a motive on Marshall's part to convert the cash into other forms of appreciable assets because he knew if he placed the proceeds in a bank, he might have to answer some uncomfortable questions about the money's origins. Furthermore, in response to questioning about his identity and the source of the funds, Marshall proceeded to produce his Florida identification, rather than his Ohio license, and informed the teller the money belonged to his step-brother. Months later, in August 1994, when Marshall learned the F.B.I. had been asking questions about the brokerage account, he told his step-brother to make the account "disappear." Taking into account all the evidence of this nature in the record, I believe a jury could have determined it was probative of the type of "design to conceal" both the assets themselves as well as their illegal origins, which the United States Court of Appeals for the Tenth Circuit found relevant in *United States v. Garcia-Emmanuel*, 14 F.3d 1469, 1478 (10th Cir. 1994), another case cited by the majority. Once the jury reached this conclusion, it could have logically inferred Marshall acted with that design to conceal in the transactions involved here.

In support of its holding, the majority relies in part on the fact Marshall purchased the wine and the diamond bracelet using valid credit cards issued in his own name. Viewing this fact in the light most favorable to the government, however,

*Norman*, 143 F.3d 375 (8th Cir. 1998), a case cited by the majority, stated:

> The statute does not require that there be any intention or design to conceal the identity of the person dealing with the property.  It requires, instead, that a defendant know that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.  There is no contention that the money used to buy the car was not the proceeds of specified unlawful activity.  The contention is, rather, that there was no proof that Norman intended to disguise the nature, location, source, ownership, or control of the money. We disagree.  The point is not whether the seller of the car is deceived as to who Norman was, but rather that by changing the proceeds of unlawful activity from the form of money (or, more properly, a bank account) — through the use of other, undisclosed business accounts — into the form of an automobile, Norman made it more difficult for the true owner of the money to trace what had happened to it.
>
> Under our cases, this is sufficient to make out a violation of the statute.

*Id.* at 377.  In this case, the evidence was, in all likelihood, insufficient to allow a conclusion Marshall was motivated by a desire to conceal his own identity during the transactions at issue.  The record, however, amply supports a conclusion Marshall engaged in those transactions in an attempt to conceal or disguise his connection with the larceny proceeds from law enforcement, the victim bank and his former employer.

The starting point for my analysis is an examination of the totality of the evidence placed before the jury and the logical inferences the jury could have drawn from that evidence. With this starting point, I do not look at each transaction in isolation.  Instead, I see each of the three purchases within the context of all the evidence.  Viewed as a whole, the evidence

1999) (holding that evidentiary rulings are reversed only if the district court abuses its discretion).

Marshall's brief also included a summary challenge to the jury instructions that permitted the jury to infer from the sudden-wealth evidence that Marshall's expenditures immediately after the larceny were funded by the stolen money.  The district court's instructions, however, accurately reflected the holding in *Amerine*.  *See Amerine*, 411 F.2d at 1132.  We also conclude that they did not have the potential to confuse or mislead the jury.  *See Innes v. Howell Corp.*, 76 F.3d 702, 714 (6th Cir. 1996) (declaring that jury instructions are to be "reviewed as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision.") (internal quotations omitted).

**B.  The district court did not abuse its discretion when it excluded evidence of Marshall's other sources of income beginning more than three years after the theft**

Marshall tendered numerous exhibits relating to his legitimate sources of income, offered for the purpose of explaining the source of the money that he was investing and spending in early 1994.  These exhibits ranged from hand-printed receipts showing that he had fixed up various old cars in exchange for money to a bank account statement that Marshall claimed reflected his propensity to save money.  All of this proffered evidence, however, involved alternative sources of income from 1997 onward, more than three years after the larceny had occurred.  Although the district court allowed Marshall to introduce exhibits and testimony regarding his finances prior to 1995, the evidence at issue was excluded as irrelevant.  Because proof of Marshall's finances from 1997 onward appears to have no relevance to his financial transactions in early 1994, we conclude that the district court's exclusion of such evidence was not an abuse of discretion.  *See Trepel v. Roadway Express, Inc.*, 194 F.3d

708, 716-17 (6th Cir. 1999) (holding that all evidentiary rulings are subject to review for abuse of discretion).

**C.  The district court's decision to conduct the charge conference, and possibly a portion of the closing arguments, in Marshall's absence does not constitute reversible error**

Marshall challenges the decision of the district court to accept his lawyer's waiver of his presence at the commencement of the charge conference on April 1, 1999. According to Marshall, he was absent from the charge conference and for a portion of the closing arguments, although there is no documentation of when he arrived nor any explanation for why he was absent. The government maintains that he arrived in the courtroom shortly after the charge conference began. Neither Marshall nor his lawyer lodged any objection with the district court concerning this alleged error.

There is no doubt that the accused has a constitutional right to be present at all the critical stages of his trial. *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) ("[D]ue process clearly requires that a defendant be allowed to be present to the extent that a fair and just hearing would be thwarted by his absence") (citations and internal quotations omitted). This right, however, is a waivable one, so long as the defendant's waiver is knowing and voluntary. *See Diaz v. United States*, 223 U.S. 442, 454 (1912). To be a knowing and voluntary waiver, a defendant "must be aware of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for remaining away." *See Taylor v. United States*, 414 U.S. 17, 19-20 n.3 (1973) (citations and internal quotations omitted).

In *Finney v. Rothgerber*, 751 F.2d 858 (6th Cir. 1985), this court determined that the district court should have held an evidentiary hearing to decide whether the defendant's absence was voluntary, so that "the issue might have been foreclosed and further litigation avoided." *Id*. at 862-63. If no such finding is made, however, as in *Finney*, we look to the record

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity. . . knowing that the transaction is designed in whole or in part . . .to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. . . shall be [guilty of a crime].

The underlying conduct for Count 3 is Marshall's purchase of the Rolex. Count 4 stems out of his purchase of the diamond tennis bracelet, and Count 5 involves his purchase of the wine. The majority has correctly stated the three essential elements of the crime:

(1) use of funds that are proceeds of unlawful activity;

(2) knowledge that the funds are proceeds of unlawful activity; and

(3) conducting or attempting to conduct a financial transaction, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds.

*United States v. Prince*, 214 F.3d 740, 747 (6th Cir. 2000). I agree with my fellow panelists that the first two elements are not at issue here. Rather, Marshall's challenge to these convictions asserts a lack of evidence pertaining to the third element, intent to conceal or disguise.

After viewing the evidence presented at trial as a whole, in the light most favorable to the prosecution, I have concluded, and a jury could have found, the record would support a finding on the third element beyond a reasonable doubt. The fact Marshall chose not to conceal his identity from those whom he made the purchases, although a relevant consideration, is not dispositive. In response to an argument similar to that presented by Appellant here, the United States Court of Appeals for the Eighth Circuit in *United States v.*

absence of evidence indicating an intent to conceal his identity, I do not believe it is dispositive here.

On appeal, Marshall claims the evidence presented during his trial was insufficient to support his three convictions for money laundering. I find it necessary at this point to reiterate the standard of review to be applied in this context. An appellate court reviewing a challenge to the sufficiency of the evidence adduced at trial must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The appellate court may not re-weigh the evidence, reevaluate the credibility of witnesses, or substitute its judgment for that of the jury. *United States v. Hillard*, 11 F.3d 618, 620 (6th Cir. 1993). Most importantly, the reviewing court must look at the evidence as a whole. *Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 797 (6th Cir. 1997) (holding jury verdict must be examined in light of entire record when determining whether it may be allowed to stand).

Marshall was convicted on Counts 4, 5, and 6 with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i):

---

a fact which supports the conclusion Marshall's intent was to convert the "dirty" bank larceny proceeds into "clean" assets that could not be traced directly to his crime. Marshall himself admitted as much during his testimony at trial:

> Q. Just the wine you purchased, you said you still have it?
> A. Yes, I do.
> Q. Did you purchase that wine as an investment?
> A. I purchased it and the watches as an investment. That's correct.

This testimony constitutes direct evidence Marshall saw the wine and the Rolex as investments. Since the only other purchase at issue involved the diamond tennis bracelet, one could logically presume the plural "watches" includes the bracelet.

as a whole to determine whether or not a defendant knowingly and voluntarily waived his right to be present at his trial. *See id*.

Because Marshall did not timely object to his absence at trial, we may reverse his conviction based on this alleged violation of his due process rights only if we determine the district court's action constituted plain error. *See* Fed. R. Civ. P. 52(b). This court has described the plain-error analysis as consisting of four inquiries: (1) whether an error actually occurred in the district court, (2) the obviousness of that error, (3) whether the error affected substantial rights, and (4) whether the compromise of substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings. *See United States v. Thomas*, 11 F.3d 620, 629-30 (6th Cir. 1993).

Marshall challenges the fact that his lawyer communicated the waiver to the judge without Marshall's consent. It is true that a waiver cannot be based on statements made by a defendant's lawyer who has not first consulted with his or her client. *See Carter v. Sowders*, 5 F.3d 975, 981 (6th Cir. 1993) ("Even if defense counsel could have validly waived defendant's right to be present for the conclusion of his trial, where defense counsel did not consult with defendant concerning the waiver and did not obtain defendant's consent, the waiver will not be binding on defendant."). Nevertheless, this is not the only way in which Marshall's right to be present may have been waived. Waiver may also be implied from the defendant's conduct. *See Finney v. Rothgerber*, 751 F.2d 858, 862 (6th Cir. 1985) (holding that despite the defendant's failure to expressly waive his presence, waiver was effected because "[i]t is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session of his trial, and had a duty to be present at the trial . . . entertained any doubts about his right to be present at every stage of his trial.") (internal citation omitted).

After reviewing the record, we conclude that, like the defendant in *Finney*, Marshall's absence from the courtroom

constituted a knowing and voluntary waiver of his constitutional right to be present. Marshall, like Finney, was free on bail. He has offered no explanation for his absence during the charge conference. Even more problematic for his claim, Marshall does not dispute that he was present in the courtroom when the district court announced the time at which court proceedings would resume the next day. We therefore conclude that Marshall's right to be present at his trial was voluntarily waived by his conduct. There is thus no need to address whether his lawyer's communication of a waiver to the district court was valid, nor do we need to apply the plain error analysis any further. We note, however, that even if we had found error in his having been absent during the charge conference, Marshall has produced no evidence that this absence substantially affected his rights or the fairness of the trial proceedings.

## D.   Sufficiency of the evidence

Marshall next challenges the sufficiency of the evidence supporting the two larceny convictions, the false currency-transaction-report conviction, and the three § 1956(a)(1)(B)(i) money-laundering convictions. (Although Marshall was also convicted of violating 18 U.S.C. § 1957, which punishes a person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000," resulting from his opening the brokerage account with $40,000 of stolen money, he does not directly challenge that conviction on appeal.)

In our review of his claim that there was insufficient evidence to support his other convictions, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). As we review Marshall's claims of insufficient proof, however, we may not "weigh the evidence, consider the credibility of witnesses or substitute

that conviction, and his conviction and sentence under 18 U.S.C. § 2113(d) for armed robbery must stand.

*Gentry*, 533 F.2d at 999.

In this case, the evidence submitted at trial was sufficient to support Marshall's convictions under both Counts 1 and 2. The evidence on both counts is also consistent, i.e., a reasonable jury could believe both that Marshall was the burglar and that he later possessed or concealed the stolen funds. If the evidence presented at trial had been mutually exclusive with respect to these two counts, that is, if a reasonable juror could not have found Marshall was the thief without also ruling out the possibility he was the subsequent receiver or possessor, then only a new trial would correct the substantive error. Here, however, Marshall's erroneous conviction on Count 2 does nothing to cast doubt on his larceny conviction. Consequently, the appropriate remedy in this case, according to the rule announced in *Gaddis* as interpreted in *Gentry* and *Moore*, is vacatur of the section 2113(c) conviction (Count 2), rather than remand for a new trial on Counts 1 and 2.

## II. Marshall's Convictions Under 18 U.S.C. § 1956(a)(1)(B)(i)

I do not disagree with the facts and the law as set forth in the portion of the majority's opinion dealing with Marshall's money laundering convictions. Where I part company with the majority is in the relative significance I believe should be placed on the absence of evidence indicating an intent, on Marshall's part, to conceal his identity at the time each of the disputed transactions was consummated, and on whether those transactions were ordinary commercial transactions or investments.[1] Although Appellant emphasizes in his brief the

---

[1] Although the majority characterizes Marshall's purchase of the wines, a Rolex and a diamond tennis bracelet as a "few isolated purchases of wearable or consumable items," I think the evidence was sufficient to allow a jury to conclude Marshall made each purchase as an investment,

conviction and sentence on the possession charge are not set aside, we note that 'It is well understood that a multiplicity of sentences impairs a prisoner's opportunities for pardon or parole.'" *Id.*, (citing *Hibdon v. United States*, 204 F.2d 834, 839 (6th Cir. 1953); *and Machibroda v. United States*, 338 F.2d 947, 949 (6th Cir. 1964)). The evidentiary foundation for the defendant's convictions in *Gentry* was similar to that present here:

> Upon the trial of the case the evidence reflected most clearly that upon December 3, 1971, the petitioner and his co-defendant, Clayton, using a stolen automobile, armed with shotguns, and wearing ski masks, robbed at gun point a bank security officer of $194,200.00 as the officer was in the process of delivering cash to the bank. Upon January 10, 1972, search warrants led to the recovery of $88,100.00 of the proceeds of the robbery from the petitioner's home and the recovery of $84,000.00 of the proceeds of the robbery from the home of the co-defendant, Clayton, together with the weapons and other paraphernalia used in the robbery. The jury returned a verdict finding all defendants guilty as charged in each of the two counts of the indictment.

*Gentry v. United States*, 386 F. Supp. 1126, 1127-28 (E.D. Tenn. 1974). The evidence was therefore sufficient to establish both Gentry's participation in the theft, as well as his subsequent possession of stolen property. On appeal, the panel held the error entitled him to vacatur of his conviction under section 2113(c) but did not justify a new trial on both the robbery and the receipt and possession counts:

> We find *Gaddis* controlling with regard to Gentry's contention that he is entitled to a new trial under *Milanovich, supra*. As in *Gaddis*, the evidence showed that Gentry was a direct participant in the bank robbery and there is no evidence that he received the proceeds from a different bank robber. Thus the error of the district judge in allowing him to be convicted for violation of § 2113(c) can be fully corrected by vacating

our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).

### 1.    *The larceny convictions*

Marshall was convicted of bank larceny in violation of 18 U.S.C. § 2113(b) ("Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $1,000 belonging to . . . any bank . . . shall be fined under this title or imprisoned not more than ten years, or both"). He was also convicted of receiving money stolen from a bank in violation of 18 U.S.C. § 2113(c) ("Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value which has been taken or stolen from a bank . . . in violation of subsection (b), knowing the same to be property which has been stolen shall be subject to the punishment provided in subsection (b) for the taker.").

The United States Supreme Court has held that such a dual conviction is improper. In *United States v. Gaddis*, 424 U.S. 544 (1976), the Court concluded that, in enacting § 2113(c), "Congress was trying to reach a new group of wrongdoers, not to multiply the offense of the bank robbers themselves." *Id*. at 547 (citations and internal quotations omitted). It determined that "§ 2113(c) reaches a different group of wrongdoers, i. e., those who receive the loot from the robber." *Id*. at 548. Nonetheless, despite the rule of *Gaddis*, Marshall was convicted under both § 2113(b) and § 2113(c) for the same illegal act.

The government stated at oral argument that the inclusion of the § 2113(c) charge was to serve as an alternative to Marshall's indictment under § 2113(b), based on the possibility that the proof might show that Myers, Marshall's former courier partner at Pinkerton, was a participant in the larceny. No such proof was forthcoming. Nevertheless, the district court failed to instruct the jury that it could not convict Marshall under both § 2113(b) and § 2113(c) based on the facts before it. Therefore, with the consent of the

government, we set aside Marshall's conviction under 18 U.S.C. § 2113(c) because of the plain error presented.

The remaining larceny conviction, under 18 U.S.C. § 2113(b), has two key elements: (1) the carrying away of bank property or money exceeding $1,000, and (2) the specific intent to steal. There is no dispute as to the value of the property stolen, nor that the $60,000 was taken and carried away. Rather, Marshall's argument is based on the lack of direct evidence that he was the one who took the money.

It is axiomatic that "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986). In this case, the circumstantial evidence supporting the jury's verdict is substantial. There were no signs of forced entry into the ATM, a fact strongly implicating someone who had access to the keys and security codes needed to access the vault. Marshall was one of a very small number of people with that kind of access and, further, he knew how much money was in the vault, given that he had serviced the same ATM only two days earlier. His fingerprints were the only ones found on the discarded shrinkwrap that had once contained the stolen money. Furthermore, the evidence of Marshall's sudden and unexplained wealth immediately after the theft, as well as his possession of two thousand $20 bills the day he opened his brokerage account, also points to his guilt. Finally, various witnesses testified about Marshall's evasive and inconsistent statements with reference to the brokerage account at Olde Discount a few days after the money was taken from the ATM.

This circumstantial evidence, taken together, was more than sufficient for a rational trier of fact to find, beyond a reasonable doubt, that Marshall was guilty of bank larceny. *Accord United States v. Mundt*, 846 F.2d 1157, 1160 (8th Cir. 1988) (affirming a guilty verdict for bank larceny based on evidence that the defendant had been experiencing financial difficulties, that he had access to the money and the

*Id.* at 1032 (citations and footnote omitted). In reaching that holding, the Seventh Circuit distinguished *Milanovich*:

Moore relies upon *Milanovich v. United States*, supra, in which the Supreme Court did order a new trial after holding that robbery and possession offenses could not be cumulated. 365 U.S. at 554-56, 81 S. Ct. at 729-30. In his opinion for the Court in *United States v. Gaddis*, 424 U.S. 544, 548-49, 96 S. Ct. 1023, 1026-1027, 47 L. Ed.2d 222 (1976), the author of *Milanovich*, Justice Stewart, described it as having "very unusual facts" and distinguished it. In a concurring opinion, Justice White, joined by the Chief Justice, stated that he did "not read the Court's opinion as reaffirming, in addition to describing, the *Milanovich* rule that a new trial is required when (1) a jury is erroneously permitted to convict a defendant both of bank robbery, 18 U.S.C. § 2113(a), (b), or (d), and of knowing possession of the proceeds of that robbery, 18 U.S.C. § 2113(c), and (2) there is evidence to support both convictions." *Id.* at 551, 96 S. Ct. at 1028. He also pointed out that if the jury is erroneously allowed to consider and convict on the possession count after having decided to convict on the robbery count, the conviction for possession "casts absolutely no doubt on the validity of the robbery conviction," and a new trial should not be required. *Id.* at 551-53, 96 S. Ct. at 1028. Justice Stewart did not disclaim Justice White's interpretation of the majority opinion.

*Id.*

In *Gentry v. United States*, 533 F.2d 998, 999-1000 (6th Cir. 1976), a panel of this Court, applying *Gaddis*, held the petitioner's dual convictions for both bank robbery and receipt or possession of stolen bank property could not be allowed to stand even where the dual convictions had no impact at sentencing because the sentences imposed on each count were to be run concurrently: "Although Gentry has not shown specific adverse consequences which might arise if his

Counts 1 *and* 2. He should only have been convicted of one or the other.

The *Gaddis* Court further held, where the evidence introduced at trial was clearly insufficient to support a conviction under section 2113(c), but was adequate with regard to the theft conviction, the appropriate remedy on appeal was simple vacatur of the section 2113(c) conviction. The theft conviction could be allowed to stand. *Id.* at 549-550. *Gaddis* did not, however, overrule *Milanovich v. United States*, 365 U.S. 551 (1961), in which the Supreme Court held both the theft conviction and the receipt or possession conviction should be vacated where the evidence would only support a conviction on one count or the other, but not both. *Id.* at 549, 96 S. Ct. 1027.

In *United States v. Moore*, 616 F.2d 1030 (7th Cir. 1980), the United States Court of Appeals for the Seventh Circuit provided a helpful clarification of *Gaddis*, indicating *Gaddis*, rather than *Milanovich*, would provide the appropriate remedy in most cases presenting this issue. In *Moore*, the Seventh Circuit was faced with a situation where "the evidence was ample to sustain a conviction on both counts" of theft and possession of United States Postal Service funds. *Id.* at 1031. The Seventh Circuit did not, however, think a new trial was warranted under the circumstances:

> There is no reason to require a new trial under the circumstances present in this case. By its verdict the jury found on the basis of adequate evidence that Moore robbed the postal employee and later had pieces of mail from the robbery in his possession. These findings are of course perfectly consistent with one another. The reason they will not support convictions for both robbery and possession is a legal one: we will not impute to Congress an intention to punish the thief twice. This, obviously, is a reason for vacating the conviction for the possession that inevitably follows the robbery but, equally obviously, not for requiring a new trial.

opportunity to steal, and that his wealth suddenly increased immediately after the larceny). Accordingly, although his conviction for violating 18 U.S.C. § 2113(c) is set aside, we affirm Marshall's conviction for violating 18 U.S.C. § 2113(b).

### 2. *The conviction for filing a false currency transaction report*

Federal law requires a bank to file a currency-transaction report with the Secretary of Commerce for every cash transaction of more than $10,000 in which that financial institution participates. *See* 31 U.S.C. § 5313 (requiring the filing of a currency-transaction report for a transaction in an amount greater than whatever figure is set by the Secretary of the Treasury); 31 C.F.R. § 103.22 (setting that amount at $10,000). It is a crime to cause a financial institution to make material misstatements or omissions on any currency-transaction report made pursuant to these provisions. *See* 31 U.S.C. § 5324(a)(2); *see also* 31 U.S.C. § 5324(c) (codifying the penalty for violating this section).

Marshall's conviction under § 5313 and § 5324(a)(2) was based on the false information he gave to officials at Bank One, where he procured a cashier's check in exchange for the $40,000 in stolen cash. The form filed by the bank listed Weston as the owner of the cash, with Marshall as a courier in the employ of Weston. There is no dispute that this information was a material misstatement of the facts. Aldridge, the Bank One supervisor who handled this transaction, testified at trial that "if you look on the form, I believe I checked off that he was the courier, and his name would have been in both places if he was the owner of the cash." She also said that Marshall told her that "[h]e was not the owner of this currency, and that he was merely dropping the money off for this other customer, John Weston, and it was not his money."

Marshall's claim of error based on this evidence is simply a challenge to the weight that the jury assigned to Aldridge's testimony. He denies that he ever said these things to the

Bank One official, or that he communicated any misinformation when procuring the cashier's check. This claim of error is not, therefore, a challenge to the sufficiency of the evidence. Rather, Marshall is challenging the determination of the jury to believe Aldridge.

A credibility determination made by the finder of fact, however, is rarely reversible error. *See Bueno v. Mattner*, 829 F.2d 1380, 1384 (6th Cir. 1987) ("[W]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.") (citations and internal quotations omitted). Accordingly, we find no error in Marshall's conviction for causing Bank One to file a currency-transaction report containing material misstatements.

### 3.   *The § 1956(a)(1)(B)(i) money laundering convictions*

Marshall was convicted on three counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), based on his purchases of a Rolex watch, a tennis bracelet, and expensive wine. In his challenge to these convictions, Marshall asserts that the government proffered insufficient evidence to support the jury's verdict against him.

The statute under which Marshall was convicted provides as follows:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity – –
>
> . . . .
> (a)(1)(B) knowing that the transaction is designed in whole or in part-(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
>
> . . . .
>     shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the

---

### CONCURRING IN PART, DISSENTING IN PART

---

CURTIS L. COLLIER, District Judge, concurring in part and dissenting in part. I concur in parts II.A, II.B, II.C, and II.D.2 of the majority's well-reasoned and well-written decision. I write separately to explain more completely my concurrence in part II.D.1, and because I must respectfully dissent from the majority's holding in part II.D.3 with respect to the money laundering counts under 18 U.S.C. § 1956(a)(1)(B)(i). I agree with the facts and the law as set forth in the majority's opinion; however, I disagree with their conclusion "no rational trier of fact could convict Marshall of violating § 1956(a)(1)(B)(i)" on the basis of the evidence presented at trial.

#### I. Marshall's Conviction Under 18 U.S.C. 2113(c)

I concur with the majority's conclusion that Marshall's conviction, pursuant to section 2113(c), for receiving or possessing stolen goods, should be vacated and remanded for dismissal by the district court. I believe, however, that further explanation of the reasoning behind this result will prove helpful in the future to courts addressing this question. As stated earlier by the majority, in *United States v. Gaddis*, 424 U.S. 544 (1976), the United States Supreme Court held "[A] person convicted of robbing a bank in violation of 18 U.S.C. §§ 2113(a), (b), and (d), cannot also be convicted of receiving or possessing the proceeds of that robbery in violation of 18 U.S.C. § 2113(c)." *Id.* at 547, 96 S. Ct. at 1026. "Receipt or possession of the proceeds of a bank robbery in violation of § 2113(c) is simply not a lesser included offense within the total framework of the bank robbery provisions of § 2113. Rather, § 2113(c) reaches a 'different group of wrongdoers,' *i.e.*, 'those who receive the loot from the robber.'" *Id.* 548. The rule enunciated in *Gaddis*, when applied to the facts of this case, thus precludes Marshall's conviction on *both*

disposition will not affect the overall time of Marshall's incarceration.

transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956. A violation of § 1956(a)(1)(B)(i), then, consists of the following three elements: "(1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct or attempt to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the . . . source, ownership or control of the proceeds." *United States v. Prince*, 214 F.3d 740, 747 (6th Cir. 2000). At issue in this appeal is the third element, the intent to disguise the funds that Marshall stole from Society Bank.

In *United States v. Sanders*, 928 F.2d 940 (10th Cir. 1991), the Tenth Circuit addressed the question of how much and what kind of evidence is sufficient to support a money laundering conviction under § 1956(a)(1)(B)(i). *Sanders* involved the defendant's purchase of two cars using illegally obtained money. The defendant was personally involved in both transactions and was readily identifiable to the sales representatives. Although the defendant put the title of the second car in his daughter's name, the fact that she was present at the sale, shared the same last name as the defendant, and that the defendant used the car conspicuously after it was purchased, all "undermine[d] the government's argument . . . that the Lincoln purchase involved the requisite design of concealment." *Sanders*, 928 F.2d at 946. The court concluded that Congress did not intend for this law to be treated as a "money spending statute." *Id.*; *see also id.* at 946 n.3 (quoting selected portions of the statute's legislative history that suggest that Congress did not intend to criminalize every transaction using illegally obtained money). Therefore, under *Sanders*, the government must produce more evidence than the simple fact of a retail purchase using illegally obtained money in order to prove the "intent to disguise" element of § 1956(a)(1)(B)(i).

The "most obvious type" of evidence that would support a finding of intent to disguise the proceeds of unlawful activity

is "that of employing a third party in order to conceal the defendant's identity from others." *United States v. Lovett*, 964 F.2d 1029, 1034 n.3 (10th Cir. 1992); *accord United States v. Beddow*, 957 F.2d 1330, 1335 (6th Cir. 1992) (holding that the defendant intended to disguise the source of the proceeds, based in part on evidence that he used "front men" to purchase the items at issue). The fact that a defendant personally engages in a transaction without trying to disguise his or her identity, however, does not negate the effect of other evidence pointing to an intent to conceal. *See Lovett*, 964 F.2d at 1034 n.3; *United States v. Norman*, 143 F.3d 375, 378 (8th Cir. 1998) (holding that there was sufficient evidence to support a finding of intent to disguise the proceeds, even though the defendant used his own name and was readily identifiable to the salesperson).

Nevertheless, if a defendant is readily identifiable to the salesperson and does not use a third party to disguise his or her identity, there must be other evidence to support this element of money laundering. *See United States v. Garcia-Emanuel*, 14 F.3d 1469 (10th Cir. 1994) (applying the *Sanders* rule to various transactions that the government alleged were engaged in by the defendant with the intent to disguise the nature of his ill-gotten gains). In *Garcia-Emanuel*, the court declared:

> [A] variety of types of evidence have been cited by this and other circuits as supportive of evidence of intent to disguise or conceal. They include, among others, statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*Id*. at 1475-76 (citations omitted). Accordingly, because we believe that the analysis in *Sanders* and *Garcia-Emanuel*

circumstances present, this single misrepresentation can amount to substantial evidence that the transaction was designed to conceal illegal funds." *Id*. In contrast, the Tenth Circuit held in a later case that where a defendant is engaged in a series of complex transactions in order to purchase a house with illegally obtained money, multiple misstatements about the source of the money to bank officers responsible for the transactions in question did constitute sufficient evidence of an intent to disguise the source of the money. *See United States v. Lovett*, 964 F.2d 1029, 1034-36 (10th Cir. 1992).

Unlike *Lovett*, and similar to *Garcia-Emanuel*, Marshall made only one misstatement regarding the watch. Furthermore, in contrast to the situation in both *Lovett* and *Garcia-Emanuel*, Marshall lied to an individual completely unrelated to the purchase in question, and even this was after-the-fact. Although such a misstatement might support a finding of intent to conceal when combined with additional evidence, this one lie is insufficient standing alone to support a rational trier of fact's conclusion that Marshall violated § 1956(a)(1)(B)(i) when he purchased the Rolex watch. We therefore set aside Marshall's conviction for money laundering based on the Rolex watch transaction for the same reasons we do so in relation to the tennis bracelet and wine.

### III. CONCLUSION

For all of the reasons set forth above, we **VACATE** Marshall's 18 U.S.C. § 2113(c) conviction for possession of stolen money and all three of his § 1956(a)(1)(B)(i) money-laundering convictions, and **REMAND** with instructions for the district court to enter a judgment of acquittal on these counts of the indictment. We **AFFIRM** the remaining three convictions for bank larceny under 18 U.S.C. § 2113(b), engaging in an unlawful money transaction under 18 U.S.C. § 1957, and causing a bank to file a false statement on a currency-transaction report under 31 U.S.C. § 5313 and § 5324(a)(2). Because all seven of his convictions resulted in sentences of the same length to be served concurrently, this

accompanied the Senate version of the bill eventually codified in § 1956).

Although the dissent characterizes Marshall's purchase of between $1,700 and $3,000 worth of wine as a "collectible" transaction, we find nothing in the record to indicate that Marshall intended to hold these bottles of wine as an investment for the purposes of applying § 1956. One can loosely say that every purchase not immediately consumable is an investment, but the acquisition of a consumer item such as wine provides no indication of an intent to conceal the source of the funds. The wine purchased by Marshall was indeed expensive and purchased in a somewhat greater quantity than in his past dealings with this same merchant, but there was no evidence beyond this fact to indicate any motivation beyond personal consumption. Marshall's offhand affirmative response to a question asked by the government on recross-examination as to whether he purchased the wine as an investment is not an indication that he did not intend to consume it. A defendant's acknowledgment that a purchase is an investment could be equally applied to any acquisition not immediately consumed. Accordingly, we set aside Marshall's convictions for money laundering tied to the purchases of the tennis bracelet and the wine on the basis that no rational trier of fact could convict Marshall of violating § 1956(a)(1)(B)(i) under these circumstances.

Marshall's conviction for money laundering based on the purchase of the Rolex watch presents a somewhat closer case. Regarding the watch, Marshall lied to Weston when he said that Miller had purchased it as a gift for Marshall. This does provide some evidence of Marshall's intent to disguise the purloined money. In *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1477 (10th Cir. 1994), the court addressed a similar situation in which the defendant purchased a horse and misrepresented to the seller the source of the cash that he would use to complete the transaction. The court held, however, that "[w]hile it is true that this misrepresentation brings an element of concealment into the transaction, we do not believe that, standing alone and in the face of other

reflects the proper statutory interpretation of § 1956(a)(1)(B)(i), we adopt the holdings of those cases as the appropriate rule to apply to the intent element of a money-laundering conviction.

The government's only direct evidence in support of its allegation that Marshall purchased the watch, bracelet, and wine with the intent to disguise the stolen money was that Marshall lied to Weston when he said that Miller had purchased the Rolex watch for him as a gift. Nevertheless, the government claims that there is sufficient circumstantial evidence to support Marshall's convictions under § 1956(a)(1)(B)(i) for all three purchases.

The government argues that the purchase of items having value as an investment is sufficient in itself to support a finding of intent to disguise the proceeds of the larceny. In other words, the government asks us to infer Marshall's intent to disguise based simply on the nature of the items purchased. This argument, however, would conflict with the intent of Congress to penalize only those purchases "designed in whole or in part" to hide illegally obtained property. *See* § 1956(a)(1)(B)(i); *United States v. Sanders*, 928 F.2d 940, 946 (10th Cir. 1991).

In *United States v. Garcia-Emanuel*, 14 F.3d 1469 (10th Cir. 1994), the Tenth Circuit acknowledged the competing considerations involving such purchases:

In reviewing the sufficiency of the evidence, the most difficult cases are those in which the defendant acquires an asset which both brings a present personal benefit and has substantial resale value, and thus is a potential tool for money laundering. On the one hand, cases involving investments made with illegal proceeds are close to the core of the statute's purpose of criminalizing changing cash into an ostensibly legitimate form, such as business profits or loans, before using those funds for personal benefit. On the other hand, when the defendant has merely acquired an asset that brings a significant present

personal benefit to himself or his family, the inference becomes more difficult to draw.

*Id*. at 1475. Accordingly, although "a jury could reasonably suspect that on some level [the defendant] is motivated by a desire to convert his cash into a more legitimate form," the Tenth Circuit held that even in these difficult cases, the government must produce more evidence than the investment value of the item purchased in order to support a jury's conclusion that the intent element was satisfied. *Id*. at 1474-75. We agree.

The government's other argument in support of its claim that there was sufficient evidence to support the jury's verdict regarding the three purchases in question was that the funds used to acquire these items all came from the $40,000 of stolen cash that Marshall placed into the Olde Discount brokerage account. This brokerage account was the basis for a separate unlawful monetary-transaction conviction under 18 U.S.C. § 1957, a conviction which Marshall is not directly challenging in this appeal. According to the government, then, if a pool of money is created in violation of the money-laundering statutes, every subsequent purchase that is made with those laundered funds constitutes sufficient evidence per se of an intent to conceal the source of the money. A defendant would thus be exposed to criminal liability for every derivative transaction regardless of his or her actual intent. This argument, much like the first, cannot be squared with the intent of § 1956.

Section 1956 does not make money laundering a continuing offense. *See United States v. Kramer*, 73 F.3d 1067, 1072-73 (11th Cir. 1996) (holding that multiple transfers must be analyzed individually for a violation of § 1956(a)(2)). The same is true for the transfer of illegally obtained funds under § 1956(a)(1)(B)(i). *See United States v. Prince*, 214 F.3d 740, 750-54 (6th Cir. 2000) (applying the definition of "transaction" from § 1956(c) to each transfer of money within an elaborate wire-fraud scheme). Accordingly, the fact that the source of the money used to buy the watch, bracelet, and

wine constituted a separate violation under § 1957 has no bearing on whether the latter purchases satisfied the intent prong of § 1956(a)(1)(B)(i). *See United States v. Garcia-Emanuel*, 14 F.3d 1469, 1475 (10th Cir. 1994) ("[T]he mere fact that a defendant was convicted of money laundering arising out of some transactions is not sufficient to sustain a money laundering conviction involving other transactions."). We thus conclude that Marshall's conviction pursuant to 18 U.S.C. § 1957 for the brokerage-account transaction is an insufficient basis on which to support a finding of intent to further conceal that money when he used a portion of the funds to purchase the items in question.

Without these two inferences (investment value and derivation from another illegal transaction), the government has produced absolutely no other evidence to support the jury's conclusion that Marshall purchased the tennis bracelet and the wine with the intent to conceal the money that he stole from Society Bank. Both purchases were made by Marshall in person using valid credit cards in his own name, and his identity was readily apparent to each salesperson. In fact, Marshall had made previous purchases from the same wine merchant. Although the fact that Marshall did not use a third party to make the purchases, or otherwise attempt to disguise himself, would not negate counterbalancing evidence of an intent to conceal, there was no such additional evidence in the present case.

We are also of the opinion that a few isolated purchases of wearable or consumable items directly by the wrongdoer is not the type of money-laundering transaction that Congress had in mind when it enacted § 1956(a)(1)(B)(i), especially where the value of the items is relatively small in relation to the amount stolen by the defendant. *See Sanders*, 928 F.2d at 946 n.3 ("This section ... appli[es] its coverage to those transactions that can be said to constitute the core of money laundering – transactions designed to conceal or disguise the nature, location, source, ownership, or control of criminal proceeds, or to evade Federal or State cash reporting requirements.") (quoting Senate Report No. 99-433, which