**UNITED STATES of America,**
**Plaintiff,**

v.

**Ok Soon HOGAN, Defendant.**

**United States of America, Plaintiff,**

v.

**Myong Landers, Defendant.**

**United States of America, Plaintiff,**

v.

**Young H. Smith, Defendant.**

**Nos. CRIM.03–50065–01, CRIM.03–50069, CRIM.03–50070–01.**

United States District Court,
E.D. Michigan,
Southern Division.

May 10, 2004.

Roger G. Isaac, Roger G. Isaac Assoc., Flint, MI, for Ok Soon Hogan, Myong Landers, Young H. Smith, Defendants.

Nancy A. Abraham, Eastern District of Michigan, U.S. Attorney's Office, Flint, MI, for United States of America, Plaintiff.

*OPINION AND ORDER DENYING DEFENDANTS' (1) MOTIONS TO QUASH INDICTMENT AND (2) MOTIONS TO QUASH SEARCH WARRANT AND SUPPRESS EVIDENCE*

GADOLA, District Judge.

## I. INTRODUCTION

Before the Court are six motions in three different, but very similar, criminal cases. The matter involves allegations of conspiracy, money laundering, racketeering, and prostitution.

The first case is *United States v. Ok Soon Hogan*, No. 03–50065–01. Hogan has filed (1) a motion to quash indictment and (2) a motion to quash search warrant and suppress evidence. There is one additional defendant in this case, Defendant Kil Cha Thatcher. Matters concerning Thatcher are not addressed in this opinion and order.

The second case is *United States v. Myong Landers*, No. 03–50069. Defendant Myong Landers likewise has filed (1) a motion to quash indictment and (2) a motion to quash search warrant and suppress evidence. There are no additional defendants in this case.

The third case is *United States v. Young Smith*, No. 03–50070–01. Defendant Young Smith also has filed (1) a motion to quash indictment and (2) a motion to quash search warrant and suppress evidence. There are two additional defendants in this case, Defendant Unju Mannion and Defendant Theodore Shaner, Jr. No motions have been filed on behalf of Mannion or Shaner.

The three motions to quash indictment are substantially similar as are the three motions to quash search warrant and suppress evidence. The Court held a hearing on all six motions on April 29, 2004. For the reasons set forth below, the Court will deny all six motions.

## II. BACKGROUND

The three cases originate from a federal investigation into numerous business establishments that held themselves out as Asian massage parlors and/or health spas in the Bay City, Flint, and Saginaw areas of Michigan. Three of the establishments and three individuals who owned and/or managed these three establishments are in question in the present matters before the Court: (1) Hogan is associated with the Oriental Health Spa, 3606 South Saginaw Street, Flint; (2) Landers is associated with Chuggy Enterprises, d/b/a Chuggy's Pressure Point, G–3324 Corunna Road, Flint; and (3) Smith is associated with the Yoko Health Spa and/or Yoko Oriental Massage, 3213 Davison Road, Flint.

In each case, United States Magistrate Judge Charles Binder issued a search warrant on July 19, 2002. The three search warrants are nearly identical. The search warrants sought business and financial records at the three aforementioned establishments. In each case, the basis for issuing the search warrant was an application and affidavit (hereinafter "affidavit") signed by Francine Gross, Special Agent, Federal Bureau of Investigation, on July 19, 2002. The search warrants were executed on July 23, 2002.

### A. Hogan Indictment

With respect to Hogan, on November 5, 2003, the grand jury rendered a thirty-three-count indictment. Count one charges conspiracy, 18 U.S.C. § 371. Allegedly, Hogan conspired with a co-defen-

dant and others to launder money, 18 U.S.C. § 1956, and to use an interstate facility to aid in racketeering, 18 U.S.C. § 1952. According to the indictment, the conspiracy had the following two objectives:

to conduct and attempt to conduct financial transactions which involved the proceeds of a specified unlawful activity, that is, use of an interstate commerce facility to aid in racketeering; and

to use and cause to be used a facility in interstate commerce with intent to facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a business enterprise involving prostitution.

Indictment (No. 03–50065–01) at 2.

Counts two through sixteen charge Hogan and a co-defendant with money laundering, 18 U.S.C. § 1956(a)(1)(A)(i),[1] as well as aiding and abetting, 18 U.S.C. § 2. Specifically, Hogan allegedly conducted financial transactions that involved the proceeds of unlawful activity with the intent of facilitating unlawful activity. The transactions at issue included checks issued to a co-defendant, Consumers Energy, and the *Flint Journal.* Counts two through sixteen comprise fifteen individual transactions occurring between July 1, 2001 and July 1, 2002.

Counts seventeen through thirty-two charge Hogan with using an interstate commerce facility to aid in racketeering, 18 U.S.C. § 1952(a)(3).[2] Specifically, Hogan allegedly made sixteen telephone calls from the Oriental Health Spa to a location outside the State of Michigan with the intent of facilitating an unlawful activity: a business enterprise involving prostitution in violation of Michigan Complied Laws §§ 750.448, 750.449, 750.450, 750.452, 750.455, and 750.457.[3] Each count concerns individual telephone calls made between April 24, 2002 and July 21, 2002. The alleged purpose of each call was to obtain authorization from a bank or credit card company to accept payment for prostitution-related activities.

Lastly, count thirty-three is a forfeiture allegation under 18 U.S.C. §§ 981 & 982 and 28 U.S.C. § 2461.

### B. Landers Indictment

Similarly, on November 5, 2003, the grand jury rendered a thirty-four-count indictment against Landers. Count one charges conspiracy, 18 U.S.C. § 371. Like

---

1. 18 U.S.C. § 1956(a)(1)(A)(i): "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity ... shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

2. 18 U.S.C. § 1952(a)(3): "Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to ... promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or

carrying on, of any unlawful activity, and thereafter performs or attempts to perform [an aforementioned act (i.e., promoting, managing, establishing, carrying on, or facilitating the promotion, management, establishment, or carrying on, of any unlawful activity)] shall be fined under this title, imprisoned not more than 5 years, or both."

3. Mich. Comp. Laws §§ 750.448 ("Soliciting and accosting"); 750.449 ("Receiving or admitting person to place or vehicle for purpose of prostitution, lewdness, or assignation"); 750.450 ("Aiding, assisting, or abetting commission or offer of commission of act prohibited under sections 448 or 449"); 750.452 ("House of ill-fame; keeping, maintaining or operating"); 750.455 ("Pandering"); & 750.457 ("Earnings of prostitute, accepting").

Hogan, Landers allegedly conspired with others to launder money, 18 U.S.C. § 1956, and to use an interstate facility to aid in racketeering, 18 U.S.C. § 1952. The conspiracy had the same two objectives detailed in the aforementioned indictment against Hogan.

Counts two through fourteen charge Landers with money laundering, 18 U.S.C. § 1956(a)(1)(A)(i). As with Hogan, Landers allegedly conducted financial transactions that involved the proceeds of unlawful activity with the intent of facilitating the unlawful activity. The transactions at issue included checks issued to an apparent landlord, Carman Plaza LLC, as well as Consumers Energy. Counts two through fourteen concern thirteen individual transactions occurring between June 11, 2001 and July 28, 2002.

Counts fifteen through thirty-three charge Landers with using an interstate commerce facility to aid in racketeering, 18 U.S.C. § 1952(a)(3). Landers allegedly made nineteen telephone calls from Chuggy's Pressure Point to a location outside the State of Michigan with the intent of facilitating an unlawful activity: a business enterprise involving prostitution in violation of the aforementioned Michigan statutes. Each count concerns individual telephone calls made between April 7, 2002 and July 15, 2002. As with Hogan, the alleged purpose of each call was to obtain authorization from a bank or credit card company to accept payment for prostitution-related activities.

Finally, count thirty-four is a forfeiture allegation under the same aforementioned statutes.

### C. Smith Indictment

Furthermore, on November 5, 2003, the grand jury rendered a fifty-nine count indictment in Smith's case; however, only counts one through thirty-one and count fifty-nine concern Smith. Again, count one

charges conspiracy, 18 U.S.C. § 371. Allegedly, Smith conspired with two co-defendants and others to launder money, 18 U.S.C. § 1956, and to use an interstate facility to aid in racketeering, 18 U.S.C. § 1952. The conspiracy had the same two objectives detailed in the aforementioned indictment against Hogan.

Counts two through fifteen charge Smith with money laundering, 18 U.S.C. § 1956(a)(1)(A)(i). As with Hogan and Landers, Smith allegedly conducted financial transactions that involved the proceeds of unlawful activity with the intent of facilitating the unlawful activity. The transactions at issue included checks issued to the Fort Knox Federal Credit Union and the *Flint Journal.* Counts two through fifteen concern fourteen individual transactions occurring between January 17, 2001 and June 25, 2002.

Counts sixteen through thirty-one charge Smith with using an interstate commerce facility to aid in racketeering, 18 U.S.C. § 1952(a)(3). Specifically, Smith allegedly made sixteen telephone calls from the Yoko Health Spa to a location outside the State of Michigan with the intent of facilitating unlawful activity: a business enterprise involving prostitution in violation of the aforementioned Michigan statutes. Each count concerns individual telephone calls made between June 2, 2002 and July 14, 2002. As with Hogan and Landers, the alleged purpose of each call was to obtain authorization from a bank or credit card company to accept payment for prostitution-related activities.

As before, the final count, count fifty-nine, is a forfeiture allegation under the same aforementioned statutes.

### III. ANALYSIS

This opinion and order first will address the three motions to quash indictment and

then address the three motions to quash search warrant and suppress evidence.

## A. Motions to Quash Indictment

In seeking to quash their respective indictments, Hogan, Landers, and Smith (hereinafter "the defendants") raise identical arguments against their respective conspiracy, money laundering, and racketeering counts.

### 1. Conspiracy Counts

■ The defendants attack their respective conspiracy counts (count one of each indictment) by arguing that each count is duplicitous. Impermissible duplicity occurs when a single count charges "separate and distinct" crimes. *United States v. Davis*, 306 F.3d 398, 415 (6th Cir.2002). In other words, to avoid duplicity, the Government must not charge separate and distinct crimes with a single count. *See id.* The rationale against duplicity "is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both." *Id.* (quoting *United States v. Washington*, 127 F.3d 510, 513 (6th Cir.1997)).

Here, each conspiracy count in the three indictments alleges an agreement to violate two criminal statutes: laundering money, 18 U.S.C. § 1956, and using an interstate facility to aid in racketeering, 18 U.S.C. § 1952. It is well established that such a conspiracy count is not duplicitous because the crime charged is the single crime of conspiracy. *See United States v. Campbell*, 279 F.3d 392, 398 (6th Cir.2002) ("the allegation, in a single count of conspiracy, of an agreement to commit several crimes is not duplicitous, as conspiracy is itself the crime." (quoting *United States v. Dale*, 178 F.3d 429, 431–32 (6th Cir.1999) (citing *Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942)))). Moreover, contrary to the defendants' concern, the fact that multiple transactions are at issue in the conspiracy count does not render the count duplicitous because, again, the crime at issue is the single crime of conspiracy. *See Campbell*, 279 F.3d at 398. Also, "the [G]overnment's presentation of multiple factual scenarios to prove [a single] offense does not render the count duplicitous." *Washington*, 127 F.3d at 513 ("The mere existence ... of multiple theories of liability or multiple factual predicates for violation of a statute does not render the indictment duplicitous."). Accordingly, the Court will deny the defendants' duplicity challenge to their respective conspiracy counts.

### 2. Money Laundering Counts

The defendants further argue that their respective money laundering counts are duplicitous or, alternatively, multiplicitous. The counts at issue here are: Hogan, counts two through sixteen; Landers, counts two through fourteen; and Smith, counts two through fifteen.

■ As stated above, to avoid duplicity, the Government must not charge separate and distinct crimes with a single count. *See Davis*, 306 F.3d at 415. Each money laundering count concerns a single, individual, unlawful transaction. Thus, it cannot be said that the money laundering counts at issue charge separate and distinct crimes within a single count: each count involves a single criminal offense. Therefore, the Court will deny the defendants' duplicity challenge to their respective money laundering counts.

Additionally, with respect to the aiding and abetting charges included in money laundering counts in the indictment against Hogan, it is important to note that "principal liability and liability for aiding and abetting charged in same count does not render [the] count duplicitous." *United States v. Banks*, 27 Fed.Appx. 354, 359 (6th Cir.2001) (citing *United States v. Dean*, 969 F.2d 187, 195 (6th Cir.1992)).

■ Alternatively, the defendants argue that their respective money laundering counts are multiplicitous and should be treated as one continuous transaction and merged into a single count. "[A]n indictment may not charge a single criminal offense in several counts without offending the rule against 'multiplicity' and implicating the double jeopardy clause." *United States v. McCaskill*, 62 Fed.Appx. 71, 75 (6th Cir.2003) (quoting *United States v. Hart*, 70 F.3d 854, 859 (6th Cir.1995)). That is, to avoid multiplicity, the Government must not charge a single criminal offense over multiple counts. *See McCaskill*, 62 Fed.Appx. at 75. Contrary to the defendants' suggestion, 18 U.S.C. § 1956 "does not make money laundering a continuing offense." *United States v. Marshall*, 248 F.3d 525, 540 (6th Cir.2001). Here again, each money laundering count concerns a single, individual, unlawful transaction, and each transaction constitutes a separate criminal offense. *See id.* As a result, the money laundering counts are not multiplicitous, and the Court will deny the defendants' multiplicity challenge to their respective money laundering counts.

### 3. Racketeering Counts

With respect to the racketeering counts, the defendants raise the same arguments raised with respect to the money laundering counts: duplicity and multiplicity. The counts at issue here are: Hogan, counts seventeen through thirty-two; Landers, counts fifteen through thirty-three; and Smith, counts sixteen through thirty-one.

Once again, to avoid duplicity, the Government must not charge separate and distinct crimes with a single count. *See Davis*, 306 F.3d at 415. Each racketeering count concerns an individual transaction involving a request for authorization from a bank or credit card company to accept payment for prostitution-related activities. Thus, it cannot be said that the racketeering counts at issue charge separate and distinct crimes within a single count: each count involves a single criminal offense. Consequently, the Court will deny the defendants' duplicity challenge to their respective racketeering counts.

Alternatively, the defendants argue that their respective racketeering counts are multiplicitous and should be treated as one continuous transaction and merged into a single count. Again, to avoid multiplicity, the Government must not charge a single criminal offense over multiple counts. *See McCaskill*, 62 Fed.Appx. at 75. "[E]ach use of an interstate communication facility in furtherance of an unlawful activity constitutes a separate punishable offense" under 18 U.S.C. § 1952(a)(3). *United States v. Graham*, 856 F.2d 756, 762 (6th Cir.1988) (citing *United States v. Jabara*, 644 F.2d 574 (6th Cir.1981)). The defendants argue that the racketeering counts should be treated as a continuous transaction because several identical credit card numbers were used to perform the transactions at issue in the racketeering counts. Be that as it may, each racketeering count nevertheless concerns a single, individual transaction: an interstate request for authorization from a bank or credit card company to accept payment for prostitution-related activities. Accordingly, each racketeering count charges a separate punishable offense under § 1952(a)(3), and the Court will deny the defendants' multiplicity challenge to their respective racketeering.

Thus, for all of the above reasons, the Court will deny the defendants' respective motions to quash indictment.

### B. Motions to Quash Search Warrant and Suppress Evidence

■ In the three motions to quash search warrant and suppress evidence, the

defendants attack the Government's affidavits that served as the bases for the search warrants. Again, the affidavit in each case is virtually identical. The defendants claim that each affidavit failed to establish probable cause. Further, the defendants contend that the information contained within the affidavits was stale. Accordingly, the defendants request that the Court quash their respective search warrants and suppress all evidence seized on July 23, 2002, when the search warrants were executed, as well as all subsequently obtained evidence that was garnered from the evidence seized on July 23, 2002.

### 1. Legal Standard

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "Probable cause is assessed in light of the 'totality of the circumstances.'" *United States v. Newton*, 210 F.Supp.2d 900, 903 (E.D.Mich.2002) (Gadola, J.) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). To determine whether probable cause exists to issue a search warrant, "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317 (internal quotations omitted).

"A reviewing court should not examine de novo the sufficiency of an affidavit supporting a warrant". *Newton*, 210 F.Supp.2d at 903 (citing *Gates*, 462 U.S. at 236, 103 S.Ct. 2317). Rather, "the traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236, 103 S.Ct. 2317 (internal quotations omitted).

Furthermore, "[t]he reviewing court should pay great deference to a magistrate's probable cause determination and should not set aside a magistrate's finding of probable cause unless it is 'arbitrary.'" *Newton*, 210 F.Supp.2d at 903 (quoting *United States v. Weaver*, 99 F.3d 1372, 1376 (6th Cir.1996)). "In doubtful or marginal cases, the reviewing court should uphold the magistrate's finding." *Newton*, 210 F.Supp.2d at 903 (citing *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)). "The rationale for this deference stems from a preference for the search warrant process over warrantless searches." *Newton*, 210 F.Supp.2d at 903 (citing *Ventresca*, 380 U.S. at 106–07, 85 S.Ct. 741).

### 2. Discussion

Each affidavit in question clearly establishes a fair probability that evidence of a crime would be found in the three locations at issue—specifically, business and financial records exhibiting unlawful transactions in support of prostitution-related activities, *see* 18 U.S.C. §§ 1952(a)(3) & 1956(a)(1)(A)(i), as well as records manifesting an agreement, i.e., a conspiracy, to engage in such unlawful transactions, *see* 18 U.S.C. § 371. This conclusion is supported by the following information contained in the affidavits:

a. Gross, the affiant-agent in question, was personally involved in the investigation of the matters detailed in her affidavits for more than eight months. *See* Aff. at ¶ 1. Gross had worked as a special agent for the FBI for over six years and had participated in Asian organized crime investigations for three years. *See id.* Drawing on this training and experience,

Gross concluded that, based on her personal investigation, the investigation of other law enforcement officers, extensive physical surveillance of the targeted Asian spas, interviews of customers of these spas, police trash collections from these spas, as well as information obtained from similar Asian spa investigations across the country, the spas in question were houses of prostitution. *See id.* at ¶¶ 4 & 42. Gross also concluded that the establishments in question facilitated prostitution by placing charges for prostitution-related services on customers' credit cards. *See id.* at ¶ 42. In making a probable cause determination, considerable weight may be placed on an agent's conclusions and inferences that are based on an agent's experience and training in a particular area of law enforcement. *See United States v. Lawson,* 999 F.2d 985, 987 (6th Cir.1993) ("A judicial officer may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found, and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." (internal quotations and citations omitted)); *see also United States v. Blair,* 214 F.3d 690, 696 (6th Cir.2000); *United States v. Caicedo,* 85 F.3d 1184, 1192 (6th Cir.1996).

b. Undercover police officers paid for massages with credit cards at the Oriental Health Spa and at the Yoko Health Spa, and, after each massage began, the female masseuse offered sexual services to each officer for an additional charge. *See* Aff. at ¶¶ 55 & 58. Each officer paid the additional charge. *See id.* Then the officer at the Oriental Health Spa immediately used a ruse to exit the premises. *See id.* at ¶ 55. At the Yoko Health Spa, the masseuse began performing a sexual act on the officer, and then the officer used a ruse to exit the premises. *See id.* at ¶ 58. At that point, the masseuse reportedly said "no, you have to finish[;] no, have to show them you finished;" and then asked the officer if he was the police. *See id.* Similarly, at Chuggy's Pressure Point, an undercover police officer paid for a massage with a credit card, and, during the massage, the female masseuse began performing a sexual act on the officer. *See id.* at ¶ 47. The undercover activities at the Yoko Health Spa and Chuggy's Pressure Point were conducted in May 2002. *See id.* at ¶¶ 47 & 58. The undercover activity at the Oriental Health Spa was performed in January 2002. *See id.* at ¶ 55. Again, the affidavits were executed and the search warrants were issued in July 2002.

c. With respect to the Yoko Health Spa, an undercover police interview with a male customer in January 2002 indicated that one could purchase sexual services at the Yoko Health Spa. *See id.* at ¶ 58. The customer stated that there was one charge for the massage and an additional charge for the "extra." *Id.*

d. Three individuals associated with the Oriental Health Spa and the Yoko Health Spa have prostitution-related criminal histories:

For a period of time, apparent rental payments for the Oriental Health Spa were paid to Chung Hee Shore, who was convicted in Texas in 1990 for operating a sex-oriented establishment and who was arrested in Texas for prostitution on three occasions. *See id.* at ¶¶ 40 & 55. Shore is presently a defendant in a separate, but substantially similar, criminal case before this Court, No. 03–50067.

According to police surveillance, Chong Cha Osborne was present at the Oriental Health Spa in January and May 2002. *See id.* at ¶ 55. Osborne has a criminal history which includes a felony charge for prostitution/pandering in Michigan in 1987. *See id.* at ¶ 37.

Smith, who owns the Yoko Health Spa, has a criminal history which includes an arrest for commercializing sex and dangerous drugs in Michigan in 1986. *See id.* at ¶ 41.

e. The Oriental Health Spa and the Yoko Health Spa have connections to several other Asian spas engaged in the same alleged criminal activity:

Shore, who has ties to the Oriental Health Spa, owns the Ashiana Health Spa and the Japan Health Spa in Flint. *See id.* at ¶¶ 40, 44, & 55. In January and February 2002, police officers collected trash from the Ashiana Health Spa and uncovered a number of used condoms. *See id.* at ¶ 44.

Osborne, who also has ties to the Oriental Health Spa, has links to the Ashiana Health Spa and the Japan Health Spa as well as the Vivea Spa (a/k/a Bay City South) in Kawkawlin, Michigan. *See id.* at ¶¶ 37, 44, 45, & 55. In January 2002, Osborne, after leaving the Oriental Health Spa, was observed transporting an unknown Asian female from the Ashiana Health Spa to the Vivea Spa. *See id.* at ¶¶ 45 & 55.

Smith, who owns the Yoko Health Spa, was seen in May 2002, transporting grocery bags from Jade's Massage Therapy in Flint to the Yoko Health Spa. *See id.* at ¶ 53. Jade's Massage Therapy is owned by Smith's co-defendant, Mannion, and Mannion has a criminal history that includes an arrest for prostitution at an Asian spa in Illinois in 2000. *See id.* at ¶ 35.

Furthermore, similar to the situations discussed above, undercover police officers paid for massages at the Ashiana Health Spa in May 2002, the Japan Health Spa in June 2002, and the Vivea Spa in May 2002, and, after each massage began, the female masseuse offered sexual services to each officer for an additional charge. *See id.* at ¶¶ 44 & 45. Each officer paid the additional charge and then used a ruse to immediately exit the premises. *See id.* Moreover, at the Japan Health Spa, before the masseuse offered sexual services for a fee, she asked the officer if he was the police. *See id.* at ¶ 44. Also, at Jade's Massage Therapy in June 2002, an undercover officer paid for a massage, and then the female masseuse reportedly said "come on baby, give me more money, you know it costs more money." *See id.* at ¶ 53. The officer gave her more money, and, during the massage, the masseuse began performing a sexual act on the officer. *See id.* The officer then used a ruse to immediately exit the premises. *See id.*

Additionally, as with the Yoko Health Spa, a patron of Jade's Massage Therapy told police in February 2002 that Jade's Massage Therapy provided prostitution services. *See id.* at ¶ 53. The patron further stated that powder cocaine was available for purchase at Jade's Massage Therapy. *See id.*

f. Osborne's transportation of an individual between the Ashiana Health Spa and the Vivea Spa and Smith's transportation of grocery bags to the Yoko Health Spa are significant because such activities are consistent with the mode of operation in such houses of prostitution. Based upon the present investigation as well as similar investigations across the county, the affidavits at issue detailed how these houses of prostitution are operated: older females, generally of Asian descent, own and/or manage the businesses and younger females, also of Asian descent, work as the masseuses/prostitutes; the prostitutes live on the premises and are provided with groceries by the owners and managers; the older females stay on the premises, occasionally leaving to procure groceries and necessities for the employees; further, the prostitutes are periodically moved from one establishment to another but typ-

ically do not leave the premises while working at a particular establishment. *See id.* at ¶ 42.

g. In addition to used condoms, the aforementioned police trash collection at the Ashiana Health Spa in January 2002 uncovered a torn-up "trick sheet." *See id.* at ¶ 44. In the affidavits, Gross explained, based upon the present investigation and similar investigations across the county, the importance of such a document: transactions at such houses of prostitution are recorded on handwritten ledgers called trick sheets; the ledgers have two vertical columns for each masseuse/prostitute; the first column reflects the initial charge for the massage, and the second column represents the extra charge for sexual services; the amounts in the second column are disguised by dropping the final zero; thus, for example, 16 would represent $160; further, the transactions were totaled at the bottom of each column and then were divided by two; customarily, the owners and the masseuses/prostitutes share equally in the massage and prostitution proceeds. *See id.* at ¶ 42.

h. As suggested several times above, there is a pattern of credit card activity at the establishments in question. In the affidavits, Gross attested to this pattern by stating that the establishments in question charged customers' credit cards initially for a massage and then, shortly thereafter, charged the same credit card a second time for a considerably higher amount for sexual services. *See id.* Further, the Government's review of voluminous bank records confirmed that this credit-card-charging pattern consistently occurred at the establishments ·in question. *See id.* Again, such conclusions and inferences by a trained and experienced agent are afforded considerable weight · in probable cause determinations. *See Lawson,* 999 F.2d at 987.

i. The Oriental Health Spa, Chuggy's Pressure Point, and the Yoko. Health Spa each had access to the necessary financial accounts to conduct business; that is, each had access to checking accounts and the ability to process credit card charges. *See* Aff. at ¶¶ 47, 55, & 58. .

j. The Oriental Health Spa, Chuggy's Pressure Point, and the Yoko Health Spa each had promotional newspaper advertisements in the *Flint Journal* on January 19, 2002, and on June 21, 2002. *See id.* at ¶¶ 9, 18, 21, Ex. C–1, & Ex. C–7.

k. In the affidavits, Gross stated that based on similar investigations across the country, the proposed searches would find business and financial records on the premises in question. *See id.* at ¶ 42. Further, Gross stated that, based on her training and experience, she knew that individuals involved in criminal activity maintained records relating to their criminal activity, including business and financial records. *See id.* at ¶ 3. Gross also stated that she believed that such records would be found on the premises in question. *See id.* at ¶ 4. Once again, such conclusions by a trained and experienced agent are afforded considerable weight in probable cause determinations. *See Lawson,* 999 F.2d at 987. Additionally, common sense dictates that business enterprises possess and maintain business and financial records. *See Gates,* 462 U.S. at 238, 103 S.Ct. 2317 (probable cause determinations should be guided by common sense).

While any one of the aforementioned matters individually may not support of a finding of probable cause, the Court must look to the totality of the circumstances, and, considering all of the aforementioned matters together, there was unquestionably a fair probability: (1) that prostitution-related activities were taking place at the three locations in question, (2) that

there were unlawful transactions taken in support of such prostitution-related activities, *see* 18 U.S.C. §§ 1952(a)(3) & 1956(a)(1)(A)(i), (3) that there were agreements to engage in such unlawful transactions, *see* 18 U.S.C. § 371, and (4) that evidence, in the form of business and financial records recounting the aforementioned criminal activities (e.g., trick sheets, bank statements, cancelled checks, credit card records, telephone records, receipts, invoices, correspondence, etc.), would be found at the three locations in question. Therefore, probable cause existed and the search warrants were correctly issued.

Lastly, contrary to the defendants' contention, the information contained within the affidavits was not stale. Probable cause to search a location exists when there is a reliable indication that contraband or evidence of a crime presently exists at the location; thus, information merely showing that contraband or evidence of a crime was previously housed at a location is insufficient and is considered stale. *See United States v. Goins,* 53 Fed. Appx. 724, 727 (6th Cir.2002) (citing *Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 77 L.Ed. 260 (1932); *United States v. Spikes,* 158 F.3d 913, 923 (6th Cir.1998)). Nonetheless, staleness is not judged by the mere passage of time; rather, the question of staleness turns on factors such as the nature and duration of the crime, the nature of the items to be seized, the defendant's course of conduct, as well as the existence of corroboration of the older information with more recent information. *See United States v. Wright,* 343 F.3d 849, 864 (6th Cir.2003).

Here, the affidavits demonstrate that the alleged crimes were of an ongoing and protracted nature and continued to generate the aforementioned targeted business and financial records. *See* Aff. at ¶¶ 2, 4, 42, 47, 55, & 58. Thus, when, as here, "an affidavit recites activity indicating pro-

tracted or continuous conduct, time is of less significance" to the staleness inquiry. *United States v. Leaster,* 35 Fed.Appx. 402, 406 (6th Cir.2002) (quoting *United States v. Henson,* 848 F.2d 1374, 1382 (6th Cir.1988)). Further, the targeted business and financial records are items that do not easily perish and that are routinely stored at the place where one lives and/or works. *See United States v. Word,* 806 F.2d 658, 662 (6th Cir.1986) (information was not stale "when the events alleged in the affidavit were of a continuing nature and the documents sought were business records prepared and kept in the ordinary course of business."). As described above, the affidavit provided information about the three locations ranging from January 2002 to June 2002; due to the nature of the alleged crimes and the nature of documents at issue, this information was not stale because the affidavits provided a reliable indication that evidence of the alleged crimes existed at the three locations when the affidavits were executed and the search warrants were issued in July 2002. Therefore, the information was not stale; probable cause existed; and the search warrants were correctly issued.

Additionally, with respect to the Yoko Health Spa, information obtained in January 2002 (i.e., the customer interview) was corroborated by more recent information obtained in May 2002 (i.e., undercover police activity). *See* Aff. at ¶ 58. Such corroboration further supports the rejection of the staleness argument with respect to the Yoko Health Spa. *See Wright,* 343 F.3d at 864.

Consequently, for all of the above reasons, the Court will deny the defendants' respective motions to quash search warrant and suppress evidence.

## IV. CONCLUSION

**ACCORDINGLY, IT IS HEREBY ORDERED** that, in *United States v. Ok Soon*

*Hogan,* No. 03–50065–01, Hogan's (1) motion to quash indictment [docket entry 16] and (2) motion to quash search warrant and suppress evidence [docket entry 15] are **DENIED.**

**IT IS FURTHER ORDERED** that, in *United States v. Myong Landers,* No. 03–50069, Landers's (1) motion to quash indictment [docket entry 10] and (2) motion to quash search warrant and suppress evidence [docket entry 11] are **DENIED.**

**IT IS FURTHER ORDERED** that, in *United States v. Young Smith,* No. 03–50070–01, Smith's (1) motion to quash indictment [docket entry 18] and (2) motion to quash search warrant and suppress evidence [docket entry 19] are **DENIED.**

**SO ORDERED.**