**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0159n.06
Filed: March 1, 2005

No. 03-4346

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,              )
                                       )
    Plaintiff-Appellee,                )
                                       )
v.                                     )    ON APPEAL FROM THE UNITED
                                       )    STATES DISTRICT COURT FOR THE
CAROLYN GRAHAM                         )    SOUTHERN DISTRICT OF OHIO
                                       )
                                       )
    Defendant-Appellant.               )    OPINION
_____)

**Before: GIBBONS and ROGERS, Circuit Judges; and BUNNING, District Judge.**[*]

    **DAVID L. BUNNING, District Judge.**  On April 9, 2003, a federal jury found Carolyn

Graham guilty of money laundering and conspiracy to launder money, both in violation of

18 U.S.C. § 1956.  On October 9, 2003 Graham was sentenced to 51 months in prison.

    On appeal, Graham challenges her conviction and sentence.  As to her conviction,

Graham argues she was wrongly convicted of the money laundering charges because the

evidence established the property at issue was purchased for present personal benefit and

not for the purpose of creating the appearance of legitimate wealth.  She also protests she

was unduly prejudiced by the prosecutor's allegedly improper remarks during closing

argument.  As to her sentence, Graham argues the district court erred in denying her credit

---

[*]The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

for acceptance of responsibility on the money laundering charges, in enhancing her offense level by six levels because she had knowledge or belief that the laundered funds were drug proceeds, in enhancing her offense level by six levels because she laundered at least $50,000, in enhancing her offense level by two levels because she obstructed justice, and in refusing to give her a minor role adjustment. For the reasons set forth below, we **AFFIRM** Graham's conviction, **VACATE** her sentence, and **REMAND** for resentencing.

**I.**

The criminal charges against Graham arose based upon information learned during the investigation of Dayton, Ohio, drug dealer Joe Wright (Wright). Wright met Graham and her family following his June 1999 release from prison on prior drug trafficking charges. After his release, Wright met Tony Graham, defendant's brother, at an illegal gambling house in Dayton, Ohio. Wright testified Tony Graham offered to help him try to establish credit. Through his association with Tony Graham, Wright met and became friends with other members of the Graham family, including Jeff Graham, a professional athlete, and defendant Carolyn Graham. Wright socialized with Jeff Graham, dining out or traveling around the country to his football games or celebrity events. Wright also purchased a sizeable custom wardrobe sewn by Jeff Graham's personal tailor.

Wright testified that once released from prison, he had no legal employment and began trafficking in cocaine and heroin. His primary source of income was drug dealing. He was, however, required to report to a parole officer on his employment status. Wright testified he was hired on for a modest hourly wage at Golden Graham, the Graham family

business, which provided him with pay stubs to produce to his parole officer. As a result of his friendships, Wright started traveling to California and, while there, was introduced to persons able to provide him with a steady, less costly cocaine supply. Using this California connection, Wright was able to accumulate significant wealth by reselling the cocaine in the Dayton, Ohio, area.

Wright testified he asked Graham to "put some money away for him" sometime in early 2001. Having been robbed of cocaine and cash on previous occasions, Wright asked Graham to hide some cash for him at her home. She agreed to do so. Wright testified he trusted Graham and that their relationship during this time period was an intimate, romantic one. Graham picked up $250,000 from Wright, packaged in $25,000 bundles. When Wright subsequently retrieved the money in order to purchase more drugs, he located it in a duffel bag in Graham's bedroom closet.

In early April of 2001, Wright made arrangements to purchase 63 kilos of cocaine. When he picked up the cocaine, he took it to Graham's house to count it, then stored it in two duffel bags in the laundry area of her basement. Graham was not home when this occurred and initially was not aware that the drugs were stashed by Wright in her basement. Graham became aware of the cocaine in her basement sometime on or about April 6, 2001. A friend of Graham's, Arvin Ridley (Ridley), testified Graham called him on the evening of April 6 and suggested staging a robbery of the cocaine. Ridley recruited Shentell Smith (Smith) to assist him. They met Graham at her residence, and the 48 kilos of cocaine which remained from the original transaction were retrieved from the basement.

Smith testified Graham pointed out various items to displace in her residence so that it would appear as if ransacked. Smith then bound Graham with duct tape. While this was being orchestrated, Wright was with Jeff Graham partying at the Golden Graham premises. Wright testified they received a telephone call from Graham's residence telephone number. Wright suspected trouble, and so he and Jeff Graham, after calling Wright's cousin Antoine Jamison (Jamison), met at Carolyn Graham's residence. Graham told them two men forced their way in. Wright discovered the cocaine stored at the residence was missing.

Shortly after this occurred, Wright observed a news broadcast wherein some of the kilos of cocaine he had stashed at Graham's residence were displayed. Wright recognized the label on the packaging. He testified that he grew concerned about FBI involvement and whether they were investigating him. He decided to get away from Dayton and headed out to California for the golf tournament of professional athlete Keyshawn Johnson. While there, Wright inquired about purchasing a 1999 Cadillac Escalade Jeff Graham had at his San Diego home. Wright wanted to purchase the vehicle to use as a trade-in on a newer model Escalade he had seen at a car show. Wright testified he intended to title the vehicle in someone's else name because he did not have a job or credit to provide a basis for legitimately purchasing the vehicle himself.

In April 2001 Wright tried to buy a 2002 Escalade from a California car dealership. Carolyn Graham was with Wright in California at that time. Wright requested and Graham agreed to purchase and take title to the vehicle. Wright entered a dealership and approached a salesperson with a false story of seeking to purchase the vehicle on behalf

of an Ohio businesswoman who worked for her family company. Wright paid a $5,000 cash deposit for the vehicle; the receipt noted Carolyn Graham as the owner of those monies. The balance of the purchase price was to come from the trade-in of the 1999 Escalade and manufacturer's financing, which Graham agreed to apply for in her name. Graham's credit application was rejected, and so the deal fell through. The dealership returned the $5,000 down payment by way of a refund check made payable to Graham.

Wright subsequently located another 2002 Escalade at a different California dealership. Since Graham was unable to purchase the vehicle in her name due to her alck of credit, Wright sought the assistance of a girlfriend in California, Crystal Rogers (Rogers). At Wright's request, Rogers agreed to purchase and take title to this 2002 vehicle. This purchase was ultimately completed, using the same $5,000 down payment monies paid to the first dealership, the trade-in of the 1999 Escalade, and Rogers' financing approval for the balance of the purchase price.

By the time this second transaction took place, Graham had returned home to Dayton, Ohio. Before this second purchase attempt could be completed, the $5,000 check from the first dealership was forwarded to Graham for her to endorse the check over to the second dealership. In addition, in order for the 1999 Escalade to be used as a trade-in by Rogers, it first had to be transferred into her name. The California dealership sent transfer paperwork to Graham in Ohio. The record reflects the following series of transfer and financial transactions before the 1999 vehicle was eventually placed in Rogers' name.

Defendant's brother, Jeff Graham, bought out the lease on the 1999 Escalade in late February of 2001, for a purchase price of approximately $36,700. An Ohio title was issued in the name of Jacquelyn Webster, Jeff Graham's girlfriend. On April 26, 2001, a new Ohio title was issued in the name of Carolyn Graham; this title reflected that defendant had purchased the car from Webster for $10,000. It also reflected a purchase date of March 7, 2001, with Webster's signature as seller purportedly witnessed by notary public J. B. Gerren (Gerren). Graham had taken this title, partially completed, to her friend Gerren and asked her to notarize the signature of Jacquelyn Webster. At trial, Gerren testified Webster was not present when Gerren notarized the document, nor could she recall if Webster's signature was even on the document at the time Gerren notarized it. Graham told Gerren the vehicle had been purchased at an auto auction and Graham was buying it for a relative. Finally, a third Ohio title was issued, also on April 26, 2001, reflecting a sale of the vehicle from Graham to Rogers for the sum of $30,000. This last transfer was also listed in the Department of Motor Vehicle's documents for the state of California.

The financing arrangements and paperwork for the purchase of the 2002 Escalade were completed, and the vehicle title transferred from the dealer to Rogers. Thereafter, Wright, using an assumed name, shipped the vehicle from California to Dayton. It was delivered not to his residence, but instead to the Golden Graham business location.

Federal agents started investigating defendant Graham in mid-April of 2001 after receiving information of Graham's staged cocaine robbery. Agents were also interviewing witnesses in Ohio and California about the vehicle transactions. Crystal Rogers testified

Jeff Graham contacted her, seeking to arrange a meeting to discuss the investigation. Rogers eventually agreed to travel to Dayton, Ohio, at the expense of the Grahams. She spoke with defendant Graham about the accusations against her related to the robbery. They also discussed the vehicle transfers, specifically that Graham asked Rogers to say she purchased the vehicle from Graham and that it was not Wright's truck. Graham took Rogers to a Dayton, Ohio, attorney to discuss representation, which representation was paid for by the Grahams. Graham also took Rogers to a local jail where Wright was being held. These trips were corroborated at trial by Gerren, who traveled with them.

Ultimately, Graham was charged in a six-count superseding indictment. Count One charged Graham with conspiring with others to distribute and to possess with intent to distribute in excess of five kilograms of cocaine and in excess of fifty grams of crack cocaine and heroin, in violation of 21 U.S.C. § 846. Count Two charged Graham with conspiring with others to distribute and to possess with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. § 846. Count Three charged Graham with unlawful use of a communication facility, in violation of 21 U.S.C. § 843. Count Four charged Graham with possession with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. § 841. Count Five charged Graham with conspiracy to launder money, in violation of 18 U.S.C. § 1956. Count Six charged Graham with money laundering, in violation of 18 U.S.C. § 1956. A jury convicted Graham of the money laundering counts, but acquitted her of the drug counts.

**II.**

## A.    Challenges to Conviction

### 1.    Standard of Review

Defendant filed a combined motion for judgment of acquittal or motion for new trial and appeals the district court's rulings on the same.  A district court's denial of a Federal Rule of Criminal Procedure 29 motion for a judgment of acquittal is reviewed *de novo*. *United States v. Keeton,* 101 F.3d 48, 52 (6th Cir. 1996).  A motion for judgment of acquittal challenges the sufficiency of the evidence to support the conviction.  *United States v. King,* 169 F.3d 1035, 1038 (6th Cir.). This court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Landham,* 251 F.3d 1072, 1083 (6th Cir. 2001) (*quoting Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).  In doing so, all available inferences and credibility issues are resolved in favor of the jury's verdict.  *United States v. Salgado,* 250 F.3d 438, 446 (6th Cir. 2001).  This standard places a heavy burden upon the appellant.  *United States v. Maliszewski,* 161 F.3d 992, 1005 (6th Cir. 1998).

A Federal Rule of Criminal Procedure 33 motion for new trial is premised upon the argument that the jury's verdict was against the manifest weight of the evidence. Generally, such motions are granted only "in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Turner,* 490 F. Supp. 583, 593 (E.D. Mich. 1979), *aff'd,* 633 F.2d 219 (6th Cir. 1980).  A district judge, in considering the weight of the evidence for purposes of adjudicating a motion for new trial,

may act as a thirteenth juror, assessing credibility of witnesses and weight of the evidence.

*United States v. Lutz,* 154 F.3d 581, 589 (6th Cir. 1998). This Court's review of the trial

court's ruling is limited to determining whether it was a clear and manifest abuse of

discretion. *United States v. Hernandez,* 227 F.3d 686, 695 (6th Cir. 2000).

### 2. Money Laundering

Graham argues the district court erred in denying her motion for judgment of

acquittal and motion for new trial[1] on the money laundering charges. She protests the jury

could not have found the essential elements of money laundering beyond a reasonable

doubt because Wright purchased the 2002 Cadillac Escalade for his present personal

benefit and not for the purpose of creating the appearance of legitimate wealth.

The federal money laundering statute reads, in pertinent part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

. . . .
      (B) knowing that the transaction is designed in whole or in part –
      (i) *to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity*

. . . .

---

[1]Though Graham challenges the district court's denial of her motion for new trial on the money laundering conviction, the record is unclear as to whether such a motion was ever made. Graham filed a combined motion for judgment of acquittal or motion for new trial. The trial court, when adjudicating this motion, did not include as one of the bases asserted by Graham for new trial that the verdict was contrary to the manifest weight of the evidence. This omission by the trial court would appear to be consistent with Graham's motion, which identified the challenge to the guilty verdict as being "not supported by sufficient evidence", suggestive of a Criminal Rule 29 motion for judgment of acquittal rather than a Criminal Rule 33 motion for new trial. Both motions are nevertheless addressed, since the outcome is the same.

> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). To prevail under this statute, the government must establish "(1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct or attempt to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the ... *location, source, ownership or control* of the proceeds." *United States v. Prince,* 214 F.3d 740, 747 (6th Cir. 2000) (citation omitted) (emphasis added).

Graham's argument that Wright purchased the Cadillac for his present personal benefit rather than to create the appearance of legitimate wealth is not found within the statutory language itself. This interpretation of the statute derives from this Court's decision in *United States v. Marshall,* 248 F.3d 525 (6th Cir.). *Marshall* sets forth the governing law in this Circuit on intent to disguise for purposes of money laundering. In *Marshall* this Court adopted the reasoning of the Tenth Circuit in *United States v. Garcia-Emanuel,* 14 F.3d 1469 (10th Cir. 1994). Therein, the Tenth Circuit granted defendant's request for a judgment of acquittal on multiple counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). In analyzing whether the request had merit, the court looked to § 1956(a)(1)(B)(i)'s requirement that the transaction be designed in whole or in part to conceal the nature, location, source, ownership or control of the proceeds of specified unlawful activity. In this regard, the court reasoned:

> [T]he statute is aimed at transactions that are engaged in for the purpose of concealing assets. Merely engaging in a transaction with money whose

nature has been concealed through other means is not in itself a crime. In other words, the government must prove that the specific transactions in question were designed, at least in part, to launder money, not that the transactions involved money that was previously laundered through other means. If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute.

*Garcia-Emanuel,* 14 F.3d at 1474

Defendant relies upon too expansive an application of the "present personal benefit" phrase in the last sentence of this quote. Essentially, Graham suggests that where an item purchased is a personal consumable or used in conjunction with one's day-to-day routine, it is therefore purchased for present personal benefit, and so cannot constitute money laundering. This interpretation is overly simplistic, nor does *Garcia-Emanuel* support such a broad interpretation.

In reviewing the sufficiency of the evidence, the most difficult cases are those in which the defendant acquires an asset which both brings a present personal benefit and has substantial resale value, and thus is a potential tool for money laundering. On the one hand, cases involving investments made with illegal proceeds are close to the core of the statute's purpose of criminalizing changing cash into an "ostensibly legitimate form, such as business profits or loans, before using those funds for personal benefit...." On the other hand, when the defendant has merely acquired an asset that brings a significant present personal benefit to himself or his family, the inference becomes more difficult to draw.

*Id.* at 1475 (citation omitted). In other words, and as this Court noted in *Marshall,* in more "traditional investment" circumstances, it is enough for the government to show defendant's purchase or investment through ill-gotten gains. But if the involved transactions are for purchases of a more immediate and personal use, "the government must produce more evidence than the investment value of the item purchased in order to support a jury's conclusion that the intent element was satisfied." *Marshall,* 248 F.3d at 540. More evidence "than the simple fact of a retail purchase using illegally obtained money" is required to establish the requisite intent to disguise. *Id.* at 538.

This additional evidence of intent to disguise or conceal may be in a variety of forms,

includ[ing], among others, statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*Marshall,* 248 F.3d at 539 (quoting *Garcia-Emanuel,* 14 F.3d at 1475-76).

Graham contends evidence of intent to conceal or disguise was lacking because Wright was personally involved in the transactions -- entering the dealerships, negotiating for purchase, and then using the vehicle as his mode of transportation. Graham claims Wright's financing plan for the purchase of the 2002 Escalade was fairly straightforward. All of this, argues Graham, evidences Wright purchased the vehicle for his present personal benefit, not for purposes of laundering money.

This selective view of the evidence falls short of that needed to grant a new trial or judgment of acquittal. The record contains evidence the financing arrangements were not straightforward; rather, Wright's purchase of a 2002 Escalade was accomplished only through a series of transactions intended to disguise Wright's involvment. The cash down payment was monies possessed by Wright, though this was never disclosed. Although Graham knew them to be Wright's funds, they were recorded by the first dealership as provided by Graham, and the refund check was made payable to her.

Though Wright had sufficient drug proceeds to purchase the 2002 Escalade outright, the purchase price was instead to be financed by Wright's purchase and subsequent trade-in of the 1999 Escalade leased to Jeff Graham and/or his girlfriend Jacquelyn Webster. The 1999 Escalade was purchased in Webster's name, after she was wired $40,000 to fund the lease buyout. Webster then transferred title to the car to Graham for only $10,000 while, that same day, Graham transferred the car to Crystal Rogers for $30,000. Graham was directly involved with finalizing the paperwork for the various transfers of title for the 1999 Escalade, none of which were ever in Wright's name.

The balance of the purchase price for the 2002 Escalade was accomplished through financing. Graham applied for financing in her name at the first dealership, knowing full well it was Wright who was purchasing the vehicle. Graham was aware her application was rejected, and financing was ultimately approved by the second dealership in Rogers' name. Each of these three referenced Escalades that were located in California, far from Wright's home in Ohio. Once the 2002 Escalade from the second dealership was titled in the name of Rogers, a California resident, Wright arranged to have the vehicle shipped from California to Ohio, but not to his residence and under an assumed name.

The government also points to additional evidence supportive of intent to conceal or disguise, though not expressly noted by the district court. This includes evidence Graham's actions in the purchase attempts were of an unusually secretive manner, suggesting she was trying to conceal the laundering activities. It also includes giving false information to Gerren, the notary, about the source and purpose of buying the 1999 Escalade, and paying to have Crystal Rogers fly from California to Dayton so that Graham could meet with her to convince her to tell investigating authorities she purchased the 2002 Escalade from Graham and that Wright had nothing to do with it.

It is a stretch to characterize this series of transactions as straightforward financing, or to try and explain away these crucial aspects of this purchase activity by arguing Wright had poor credit. While Wright may have been personally involved in these activities in the sense that he was physically present, he intentionally concealed his own legal identity from any of the activities or documentation and concealed that he provided the monies for the down payment, trade-in, or balance financed. And, importantly, Wright himself testified he arranged the purchase transactions in the manner described above so that they would appear to be legitimate. Graham was aware of and involved in virtually all of these concealed financing arrangements -- the $5,000 down payment monies; applying for financing in her name for the first attempted purchase; taking title to the 1999 Escalade in her own name, after providing the notary for the transfer documents, and then transferring that title to Rogers in California for her to assist Wright; and meeting with Rogers to persuade her to deny Wright's connection with the vehicle. All of this conduct evidences Graham's intent to help Wright conceal his payment for and ownership of the vehicle.

At trial, the district court, at Graham's request made pursuant to *Garcia-Emanuel*, gave the jury an instruction that if the jury concluded the transaction was engaged in for present personal benefit and not to create the appearance of legitimate wealth, the transaction was not money laundering. All of the evidence noted above was presented for the jury's consideration. Based thereon and despite the instruction, the jury concluded there was sufficient evidence beyond a reasonable doubt of an intent to disguise to create the appearance of legitimate wealth. There was sufficient evidence for this conclusion.

Graham nevertheless insists that money laundering cannot occur in the type of transaction at issue here, Wright's purchase of a vehicle for his undisputed present personal use or benefit. Graham contends the factual circumstances here are similar to those of *United States v. Marshall*, wherein this Court vacated defendant's money laundering convictions for purchase of items for personal use and benefit. 248 F.3d at 542. Defendant Marshall had purchased a diamond tennis bracelet, expensive wine, and a Rolex watch with stolen monies. *Id.* at 538. This Court concluded there was insufficient evidence of an intent to conceal by Marshall necessary to support the money laundering charges for these purchases. Marshall purchased the bracelet and wine in person, using a valid credit card in his own name. His identity was readily apparent to the salesperson. He did not attempt to use a third party to make the purchases, nor attempt to disguise himself as the true purchaser. *Id.* at 541. Unlike the bracelet and wine, there was additional evidence of concealment of Marshall's Rolex purchase. Marshall lied to his

stepbrother about how he came to possess the expensive watch, telling him it was a gift from his girlfriend. *Id.* Although a closer call, this Court noted that Marshall's efforts in concealing the source of proceeds for the watch did not arise in connection with the initial purchase, nor was there any other evidence of intent to conceal or disguise the item. *Id.* at 542. In so holding, we noted "that a few isolated purchases of wearable or consumable items directly by the wrongdoer is not the type of money-laundering transaction that Congress had in mind when it enacted § 1956(a)(1)(B)(i), especially where the value of the items is relatively small in relation to the amount stolen by the defendant." *Id.* at 541

Graham would have us ignore analysis of intent where items of present personal benefit are purchased. Her efforts to use *Marshall* to support such a conclusion are unpersuasive. Wright's purchase was not a relatively small one. Nor, as in *Marshall,* was it an isolated purchase of a wearable or consumable item. Most importantly, *Marshall* does not do away with consideration of intent to conceal or disguise, even where small items providing a present personal benefit are involved. Indeed, we expressly noted and placed emphasis on the fact that the items purchased by Marshall were purchased by him directly.

Graham also analogizes her situation to that in *United States v. Sanders,* 928 F.2d 940 (10th Cir. 1991), a case specifically involving the purchase of vehicles. In *Marshall,* this Court adopted *Sanders'* holding that the government must come forth with more evidence than a retail purchase using illegally obtained money in order to prove intent to disguise. *Marshall,* 248 F.3d at 539. In *Sanders,* defendant's conviction for money laundering was reversed, after the appellate court concluded there was insufficient evidence at trial of an intent to conceal the source of monies used for defendant's purchase of two vehicles. The first vehicle was purchased after defendant and his wife entered the dealership and ordered a car, to be titled in defendant's wife's name. To pay for the vehicle, the couple paid a $500 deposit and, upon delivery, traded in defendant's wife's prior car, paid $3,535 in cash, and provided a credit union bank draft for the $10,000 balance. Defendant's wife had taken out a $10,000 loan from the credit union associated with her employment. For the second vehicle, defendant and his wife entered another dealership and purchased a second vehicle by trading in another car and paying the $11,400 remaining balance in cash. The dealership was instructed to title the vehicle to defendant's daughter of the same last name, to obtain lower insurance rates. Defendant's daughter also arrived on the lot a few minutes later. Defendant and his wife conspicuously used the vehicles. *Sanders,* 928 F.2d at 945. The court found insufficient evidence of concealment or intent to disguise to support the jury's conviction, noting that defendant directly and personally dealt with the dealership, the vehicles were titled to other immediate family members, with no third parties used to make the purchases and conceal the true identity of the buyer. *Id.* at 946.

Graham's efforts to analogize the facts herein to those in *Sanders* are misplaced. "[T]he purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." *Id.* Though the *Sanders* court concluded there was insufficient

evidence of such intent to disguise, such is not the case here. Efforts were made to conceal the true identity of Wright, the person intended to pay for and own this vehicle. Although Wright did enter the sales lot, he did not interact on a personal basis with the salespersons. Instead he created a false story to explain who was purchasing the vehicle. Though Wright admitted he could have paid for the vehicle outright in cash, he also made arrangements with both Graham and Rogers for them to apply in their names for financing of any balance due, all the while intending to make any payments.

This was not a straightforward transaction where Wright saw a vehicle he liked and purchased it. The purchase became a chain of events requiring Graham's assistance to allow Wright to purchase the vehicle without using his own name so as to avoid the attention to and suspicion of the lack of legitimate basis for him to purchase it. Graham was aware of and intimately involved in these arrangements.

Thus, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Graham participated in a scheme to money launder for the purpose of creating the appearance of legitimate wealth. Under a *de novo* standard of review, the district court did not err in denying Graham's motion for judgment of acquittal. Nor did the district court abuse its discretion in determining that the evidence at trial did not preponderate heavily against the verdict and so denying Graham's motion for new trial. We therefore conclude there was sufficient evidence for the jury to find Graham violated 18 U.S.C. § 1956(a)(1)(B)(i) and the district court properly rejected Graham's request to set aside her conviction on this basis.

### 3. Prosecutorial Misconduct

Graham argues the district court erred in denying her motion for a mistrial and motion for new trial based on alleged prosecutorial misconduct. She contends her defense was unfairly prejudiced after what she describes as repeated degrading and attacking remarks about her counsel by the prosecutor during closing argument. Graham challenges the following three statements of the prosecuting attorney:

> May it please the Court, ladies and gentlemen of the jury, evidence establishing guilty on one hand; *smoke screens obscuring the evidence* of guilt on the other. (JA 569)(emphasis added)

> Let's look at another one of these items thrown up to obscure the evidence. (JA 571)

> Now, in this case, there are certain groups of facts, certain items of evidence that kind of flow together, and when presented and thought about clearly, *without having obscure red herrings or smoke screens diverting your attention* from what they're really saying.... (JA 574) (emphasis added)

Graham's counsel contemporaneously objected to the first noted statement; the objection

was overruled. Counsel objected to the remaining two statements quoted above when the

prosecutor concluded his rebuttal, moving for a mistrial, which the trial court denied. These remarks were also the subject of defendant's motion for new trial.

The district court correctly noted that this Circuit reviews claims of prosecutorial misconduct under a two-part test. First, the court determines whether the remarks were improper. Second, if they were improper, the court looks at whether the remarks were also flagrant. If they were flagrant, reversal is warranted. And even if they were not flagrant, reversal is indicated where (1) proof of defendant's guilt is not overwhelming; (2) defense objected to the statements; and (3) the trial judge did not cure the impropriety through an admonishment to the jury. *United States v. Galloway,* 316 F.3d 624, 632 (6th Cir. 2003).

In first determining whether the prosecutor's remarks were improper, the district court cited decisions from other circuits involving remarks similar to those herein. Namely, in *United States v. Bernard,* 299 F.3d 467, 488 (5th Cir. 2002), the court did not find improper the prosecutor's comment that defense counsel was attempting to create a red herring. *Id.* at 488. And in *United States v. Rivera,* 971 F.2d 876, 883 (2d Cir. 1992), the court likewise did not find improper a prosecutor's description of defendant's case as based on smoke screens, distractions and distortions.

Graham fails to address and distinguish these cases. Instead, Graham argues the prosecutor's remarks here were improper under *United States v. Collins,* 78 F.3d 1021 (6th Cir.), *cert. denied,* 519 U.S. 872 (1996). In *Collins*, the prosecutor remarked that he deserved an Academy Award for keeping a straight face and not laughing at defense counsel during his closing. The remarks herein do not descend to the type of personal

attack on defense counsel involved in *Collins.* In addition, even though this Court found the remarks at issue in *Collins* to be unprofessional, defendant's conviction was nevertheless upheld. Graham also relies upon *United States v. Carter*, 236 F.3d 777 (6th Cir. 2001). The defendant's conviction was reversed in *Carter,* based on prosecutorial misconduct in repeatedly insisting defense counsel had lied. The remarks in *Carter* go a step further than those in *Collins* in their personal attack upon defense counsel.

In the case *sub judice,* the prosecutor does not label defense counsel's argument as laughable, nor accuse counsel of lying. The remarks were not so much a personal attack on counsel as a commentary on the strength of the merits of Graham's defense, similar to the circumstances in both *Bernard* and *Rivera.*

Graham cites cases from other jurisdictions, representing that those courts held as improper comments similar to those herein. A brief examination of these decisions reveals they lack the analytical strength Graham places upon them. In *United States v. De La Vega,* 913 F.2d 861, 872 n.11 (11th Cir. 1990), the court, in a footnote, criticized the prosecutor's remarks that defendant was "tripping over his own lies" and that defense tactics were "smoke screens." The court stated, in conclusory fashion, that these remarks were "improper", with no actual analysis or legal reasoning on this point, but rather concluding the remarks "were not so pronounced and persistent as to permeate the entire atmosphere of the trial." *Id.*

In *Irwin v. Singletary,* 882 F. Supp. 1036 (M.D. Fla. 1995), defendant challenged the prosecutor's closing remark to the jury not to "let their clouds of smoke, these red herrings

that are thrown along the pathway to confuse and send you down the wrong path, don't call these reasonable doubts." After concluding the comments were similar to those at issue in *De La Vega,* and without further legal analysis, the court noted simply that the improper comments were not so pronounced and persistent as to permeate the trial. *Id.* at 1043.

The *United States v. Procopio,* 88 F.3d 21, 32 (1st Cir. 1996), decision cited by Graham notes that the prosecutor's comments about defense's arguments being illusions, a smoke screen aimed at deflecting from the single threat of truth, were arguably excessive disparagement. The court made no express finding that the remarks were improper, but rather upheld defendant's conviction, noting that "it is unrealistic to suggest that such empty cliches seriously affected the jury's deliberations." *Id.* at 32.

Lastly, Graham cites *United States v. Rodrigues,* 159 F.3d 439 (9th Cir. 1998). Though the conviction in that case was reversed based upon a finding defendant had not received a fair trial due to the prosecutor's remarks, the circumstances are distinguishable from those herein. The *Rodrigues* court was troubled by the prosecutor's misstatement of the law to the jury and slander of defense counsel by stating that he "from the start had been trying to deceive the jury and had told the jury what was 'flat out untrue.'" *Id.* at 450-51.

In summary, the authorities noted by the district court are more factually analogous to the present case than those relied upon by Graham. The terms used by the government here are similar to those used and found by the *Bernard* and *Rivers* courts to be remarks

upon the strength of the merits of defendant's defense, rather than a personal attack or slander of defense counsel.

**B.      Challenges to Sentence**

In her appeal, Graham raises several sentencing issues. Specifically, she challenges the propriety of the district court's (1) denying her a three-level reduction under U.S.S.G. § 3E1.1(b) for acceptance of responsibility on the money laundering charges; (2) imposing a six-level enhancement under U.S.S.G. § 2S1.1(b)(1) after concluding she knew or believed the laundered funds were the proceeds of distribution of cocaine or heroin; (3) imposing a six-level enhancement under U.S.S.G. § 2B1.1 after concluding she laundered at least $50,000; (4) imposing a two-level enhancement under U.S.S.G. § 3C1.1 after concluding she obstructed justice; and, (5) denying her a two-level decrease under U.S.S.G. § 3B1.2(b) for minor participant status.

Defendant argues that while the sentence did not exceed the statutory maximum, the judicial fact-finding undertaken by the district court in determining her sentence violated the Sixth Amendment as determined in *Blakely v. Washington,* 124 S.Ct. 2531 (2004). With the recent decision in *United States v. Booker*, 125 S.Ct. 738 (2005), it is necessary that we vacate the defendant's sentence and remand to the district court for resentencing. *United States v. Barnett,* ___ F.3d ___, No. 04-5252, 2005 WL 357015 (6th Cir. Feb. 16, 2005); *United States v. Oliver*, ___ F.3d ___, No. 03-2126, 2005 WL 233779 (6th Cir. Feb. 2, 2005); *United States v. Bruce*, ___ F.3d. ___, No. 03-3110, 2005 WL 241254 (6th Cir. Feb. 3, 2005).

**III.**

Accordingly, we **AFFIRM** defendant's convictions, and **REMAND** for the district court

for resentencing in light of *United States v. Booker.*